UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————
                                                    )
In re:                                              )          Chapter 7
                                                    )
MAGNESIUM CORPORATION OF                            )
AMERICA, *et al.*,                                  )          Case No. 01-B-14312 (REG)
                                                    )
                              Debtors.              )          Jointly Administered
———————————————————————)
                                                    )
LEE E. BUCHWALD, Chapter 7 Trustee of               )
Magnesium Corporation of America and                )
Renco Metals, Inc.,                                 )
                              Plaintiff,            )
                    *against*                       )          Adversary Proceeding
                                                    )
THE RENCO GROUP, INC., a Delaware                   )          No. 03-06559 (REG)
corporation; K. SABEL HOLDINGS, INC.,               )
an Alabama corporation; KPMG PEAT                   )
MARWICK LLP; DONALDSON, LUFKIN                      )
& JENRETTE SECURITIES                               )
CORPORATION; HOULIHAN LOKEY                         )
HOWARD & ZUKIN; CADWALADER,                         )
WICKERSHAM & TAFT, LLP; IRA LEON                    )
RENNERT; ROGER L. FAY; JUSTIN W.                    )
D'ATRI; DENNIS A. SADLOWSKI;                        )
MICHAEL C. RYAN; MICHAEL H.                         )
LEGGE; RON L. THAYER; TODD R.                       )
OGAARD; LEE R. BROWN; HOWARD I.                     )
KAPLAN; KEITH SABEL; UNIDENTIFIED                  )
TRUSTEES of Trusts Established By Ira               )
Leon Rennert; and DOES I through XX,               )
                                                    )
                              Defendants.           )
———————————————————————)

DECISION AND ORDER ON DEFENDANTS'
MOTIONS TO DISMISS

i

APPEARANCES:

BEUS GILBERT, PLLC
Counsel for Lee E. Buchwald, the Debtors' Chapter 7 Trustee
4800 North Scottsdale Road
Suite 6000
Scottsdale, AZ 85251
By:   Leo R. Beus, Esq. (argued)
      Timothy J. Paris, Esq. (argued)
      Mitzi L. Torri, Esq.

SALOMON GREEN & OSTROW, PC
Counsel for Lee E. Buchwald, the Debtors' Chapter 7 Trustee
485 Madison Avenue
New York, NY 10022
By:   Nicholas F. Kajon, Esq. (argued)

ARNOLD & PORTER LLP
Counsel for The Renco Group, Inc., the Estate of Justin D'Atri, Roger L. Fay, Dennis A.
Sadlowski, Michael C. Ryan, Michael H. Legge, Lee L. Brown, Ron L. Thayer, Todd R.
Ogaard, Howard I. Kaplan, and the Trustees of the Trusts Established by Ira Leon Rennert
399 Park Avenue
New York, NY 10022
By:   H. Peter Haveles, Jr., Esq. (argued)
      Anthony D. Boccanfuso, Esq.

CADWALADER, WICKERSHAM & TAFT LLP
Defendant Pro Se and Counsel for The Renco Group, Inc., Ira Leon Rennert, the Estate of
Justin D'Atri, Roger L. Fay, Dennis A. Sadlowski, Michael C. Ryan, Michael H. Legge,
Lee L. Brown, Ron L. Thayer, Todd R. Ogaard, Howard I. Kaplan, and the Trustees of the
Trusts Established by Ira Leon Rennert
100 Maiden Lane
New York, NY 10038
By:   Jonathan M. Hoff, Esq.

KING & SPALDING LLP
Counsel for The Renco Group, Inc., Ira Leon Rennert, the Estate of Justin D'Atri, Roger L.
Fay, Dennis A. Sadlowski, Michael C. Ryan, Michael H. Legge, Lee L. Brown, Todd R.
Ogaard, Howard I. Kaplan, and the Trustees of the Trusts Established by Ira Leon Rennert
1185 Avenue of the Americas
New York, NY 10036
By:   Barry N. Seidel, Esq.

SCARCELLA ROSEN & SLOME LLP
Counsel for K. Sabel Holdings, Inc. and Keith Sabel
333 Earle Ovington Blvd., 9th Floor
Uniondale, NY 11553
By:     Lon J. Seidman, Esq. (argued)
         Alan Marder, Esq.

WILLKIE FARR & GALLAGHER LLP
Counsel for KPMG Peat Marwick LLP
787 Seventh Avenue
New York, NY 10019
By:     Terence K. McLaughlin, Esq. (argued)
         Joseph T. Baio, Esq.

MINTZ LEVIN COHN FERRIS GLOVSKY & POPEO, PC
Counsel for Houlihan Lokey Howard & Zukin
666 Third Avenue, 25th Floor
New York, NY 10017
By:     Dominic J. Picca, Esq. (argued)
         Stephanie K. Hoos, Esq.
         Peter B. Zlotnick, Esq.

SHEARMAN & STERLING LLP
Counsel for Credit Suisse First Boston LLC
599 Lexington Avenue
New York, NY 10022
By:     Richard F. Schwed, Esq. (argued)
         Stuart J. Baskin, Esq.
         Adam S. Hakki, Esq.

TABLE OF CONTENTS

Facts                                                                                    2
   A.  The Debtors and the Parties to this Action                          3
   B.  MagCorp's Operations                                               5
   C.  The 1996 Bond Offering and Related Payments                        6
   D.  Activities of Outsider Defendants                                  8
      1.  Houlihan                                         8
      2.  DLJ                                              9
      3.  Cadwalader                                       10
      4.  KPMG                                             12
   E.  Rennert                                                            12
   F.  Director and Officer Defendants                                    13
   G.  MagCorp Officer Defendants                                         14
   H.  Sabel Industries Sale and Release of Sabel Industries Guaranty     15
   F.  Preference Claims                                                  15
Discussion                                                                               16
I.  Preliminary Matters                                                                  16
   A.  Standards for Application of Rule 12(b)(6)                          16
   B.  Choice of Law                                                      17
      1.  Choice of Law—Substantive Law                    17
      2.  Choice of Law—Statute of Limitations             18
II.  Disposition of Motions                                                              19
A.  Statute of Limitations Motions                                                       19
   1.    MagCorp Claims Against Rennert,  Director and Officer Defendants,  and
   MagCorp Officer Defendants  (Counts 28, 31-33, 36, 37, 39-41 and 45)     20
   2.    Claims Against Outsider Defendants                                25
      a.    Cadwalader (Counts 22-27)                     26
      b.    KPMG (Counts 1-7)                             34
      c.    Houlihan (Counts 15-21)                       38
      d.    DLJ (Counts 8-14, 51)                         41
B.  Substantive Motions                                                                  43
   1.  Claims Against Outsider Defendants                                  43
      a.    Standing                                      44
      b.    In Pari Delicto                               55
      c.    Wagoner Rule Exception                        57
      d.    Aiding and Abetting Fraudulent Conveyances (Counts 4 (KPMG), 11 (DLJ), 18
      (Houlihan Lokey), 24 (Cadwalader))                    63
      e.    Civil Conspiracy (Counts 7 (KPMG),14 (DLJ),  21 (Houlihan), and 27
      (Cadwalader))                                         67
   2.  Claims Against Officers, Directors, and Renco Group                 67
      a.    Breach of Fiduciary Duty                      67
      b.    Aiding and Abetting Breaches of Fiduciary Duty—Insiders     71
      c.    Civil Conspiracy (Counts 33 (Rennert), 41 (Director and Officer Defendants)72
   3.  Claims Against Sabel and Sabel Holdings                             74
   4.  Claims Against all Defendants                                       75

Remaining Contentions                                               78
Conclusion                                                         79

BEFORE:   ROBERT E. GERBER
          UNITED STATES BANKRUPTCY JUDGE


In this adversary proceeding under the umbrella of the jointly administered chapter 7 cases of Magnesium Corporation of America ("MagCorp") and MagCorp's parent Renco Metals Corporation ("Renco Metals") (collectively, the "Debtors"), Lee E. Buchwald, the estate's chapter 7 trustee (the "Trustee"), asserts a total of 51 claims against various of the defendants, alleging unlawful dividends and stock redemption, fraudulent conveyances, breaches of fiduciary duty, aiding and abetting the foregoing, and a host of additional bases for recovery. The damages sought are to be "proven at trial," but based on the claims of injury, seemingly would exceed $100 million. The various defendants move, under Fed. R. Civ. P. 12(b)(6), to dismiss 42 of the Trustee's claims,[1] asserting that they are time-barred under applicable statutes of limitations and/or fail to state claims upon which relief can be granted.

The Trustee's claims arise predominantly from:

(a) the use of the proceeds of a $150 million bond offering in 1996 (the "1996 Bond Offering")—which refinanced earlier indebtedness of about half that amount—to fund dividends ($75.7 million), redeem preferred stock ($8.5 million), and make payments to officers ($5.3 million), aggregating nearly $90 million;

(b)  additional dividends and payments to officers, in the two years thereafter, aggregating almost $15 million; and

---

[1]   Nine of the claims (seven of which are for receipt of fraudulent conveyances and unlawful dividends) are not the subject of any dismissal motions.

(c) a subsequent release of one of Renco Metals' two subsidiaries,

Sabel Industries, of Sabel Industries' responsibility as a guarantor of the

indebtedness from the 1996 Bond Offering.

The dividends and other payments, and release of the guaranty, the Trustee alleges,

constituted breaches of fiduciary duty, unlawful dividends and stock redemptions, and

fraudulent conveyances—having been effected at a time when the Debtors were

insolvent, principally by reason of massive liabilities to federal and state environmental

protection agencies arising from MagCorp's magnesium extraction operations.

In addition to suing the recipients of the dividends and other payments, and the

directors and officers who authorized them, the Trustee has sued professionals employed

by the Debtors—their accountants, legal counsel, and the investment banking firms that

were the underwriters for Renco Metals' bond offering and that issued a solvency

opinion at that time.  Those claims assert, *inter alia*, aiding and abetting, conspiracy,

malpractice, and breach of contract.

Though the Court has little difficulty denying the motions to dismiss by Renco

Group and the other recipients of the payments, and by Rennert and the other officers

and directors who authorized them, the dismissal motions filed by the outside

professionals in many cases have merit.  For the most part, the latter's motions must be

granted.  The dismissal motions are thus granted in part and denied in part, as set forth

more specifically below and in the table accompanying this decision.

<u>Facts</u>

Under familiar principles, for the purposes of determining the motions to dismiss

(and for that purpose only), the Court takes the allegations of the Complaint as true.  The

claims in the Trustee's 155-page Complaint are clouded by dozens of pages of mind-

-2-

numbing unnecessary matter.  But shorn of unnecessary detail and repetition, the key

allegations of the Complaint are as follows.

A.  *The Debtors and the Parties to this Action*

Debtor MagCorp is a Delaware corporation with its principal place of business in

Utah.  MagCorp is a wholly owned subsidiary of Renco Metals, which is also a Debtor in

these jointly administered chapter 7 cases.

Renco Metals, a Delaware corporation with its principal place of business in New

York, is in turn a wholly owned subsidiary of The Renco Group ("Renco Group"), a non-

debtor privately held New York corporation.  At least at the times relevant here, Ira

Rennert ("Rennert") was the beneficial owner, either directly or indirectly through

various family trusts (the "Rennert Trusts"), of between 95.8% and 100% of Renco

Group's stock.  He also was Chairman of the Board, CEO, and a director of Renco

Group; a director of Renco Metals; and a director of MagCorp.

Each of Renco Metals and MagCorp filed for protection under chapter 11 of the

Bankruptcy Code ("the Code") on August 2, 2001.  The Trustee was initially appointed

as a chapter 11 trustee, and after a conversion of the Debtors' cases to chapter 7, was

subsequently appointed as their chapter 7 trustee.

The Defendants in this Action are:

(i) Renco Group;

(ii) Rennert and the Rennert Trusts;

-3-

(iii) four individuals who, along with Rennert, were directors and/or officers of Renco Group, Renco Metals, and/or MagCorp ("Director and Officer Defendants");[2]

(iv) five individuals who were officers of MagCorp ("MagCorp Officer Defendants");[3]

(v) K. Sabel Holdings, Inc. ("Sabel Holdings"), which acquired the stock of Sabel Industries from Renco Metals, in December 2000;

(v) Keith Sabel ("Sabel"), who was and is President and CEO, and a director, of Sabel Industries, and who became CEO, and a director, of Sabel Holdings;[4]

(vi) KPMG Peat Marwick, LLP ("KPMG), the auditor for the financial statements of Renco Metals, MagCorp and Sabel Industries for the fiscal years 1993 through 1999, and (to the extent that is different), the financials contained in Renco Metals' 1996 Bond Offering;

(vii) Donaldson, Lufkin & Jenrette Securities Corporation ("DLJ"), an investment banking firm that was the underwriter of Renco Metals' 1996 Bond Offering;

(viii) Houlihan Lokey Howard & Zukin ("Houlihan"), an investment banking firm that served as financial advisor to Renco Metals at various times relevant to this litigation and that provided a solvency opinion in connection with Renco Metals' 1996 Bond Offering; and

---

[2]    Roger L. Fay, Justin W. D'Atri, Michael C. Ryan, and Dennis Sadlowski.

[3]    Michael H. Legge, Ron L. Thayer, Todd R. Ogaard, Lee R. Brown, and Howard I. Kaplan.

[4]    Sabel and Sabel Holdings are referred to below as the "Sabel Defendants."

> (ix) Cadwalader, Wickersham & Taft, LLP ("Cadwalader"), a law firm that represented Renco Metals as legal advisor in connection with the 1996 Bond Offering and before and after the 1996 Bond Offering, and that also represented Renco Group and Rennert.

KPMG, DLJ, Houlihan and Cadwalader are collectively referred to in this Decision as the "Outsider Defendants."[5]

*B. MagCorp's Operations*

Until the sale of substantially all of its assets to US Magnesium LLC ("USM") when MagCorp was still in chapter 11, MagCorp was engaged in the production of magnesium extracted from the brine of the Great Salt Lake in Utah. At one point, MagCorp was the third largest magnesium producer in the world, accounting for approximately 16% of worldwide production. MagCorp's production operations were conducted at a facility near Rowley, Utah (the "Rowley Facility"), adjacent to the Great Salt Lake.

The production of magnesium at the Rowley facility resulted in the generation of substantial toxic wastes. The Rowley Facility was subject to state, local and federal regulation, and its operations resulted in massive environmental liabilities.

In January 2001, the United States brought an action on behalf of the EPA seeking injunctive relief and $900 million in civil penalties against MagCorp, Renco Metals, Renco Group, Rennert, the Rennert Trusts and USM based on numerous alleged violations of federal environmental laws. MagCorp and Renco Metals sought chapter 11 protection less than eight months later.

---

[5]    In his Complaint, the Trustee refers to them as the "Professional Defendants."

## C. The 1996 Bond Offering and Related Payments

Back in 1993, Renco Metals issued $75 million in senior notes (the "Old Notes"), with a 12% coupon, maturing in 2000. Also in 1993, Renco Metals issued preferred stock to its only shareholder, Renco Group.

Thereafter, in 1996 (about four years before the Old Notes would mature), the Old Notes were refinanced, and at the same time, Renco Metals and MagCorp "were forced" by Renco Group and other (unnamed) Defendants to engage in a series of transactions that constituted (and/or resulted in) fraudulent transfers. In 1996, Renco Metals, MagCorp and Renco Metals subsidiary Sabel Industries, as co-obligors, issued $150 million in 11.5% Senior Notes, maturing in 2003 (the "New Notes"), in a public offering (the "1996 Bond Offering"). Simultaneously, Renco Metals paid approximately $90 million to Renco Group in the form of dividends and stock redemptions, and paid another $5.3 million in bonus compensation payments to the MagCorp Officer Defendants. Those transfers rendered Renco Metals and MagCorp insolvent, while Renco Group and its shareholders, Rennert and the Rennert Trusts, benefited enormously, as did the MagCorp Officer Defendants, who received the bonuses.

More specifically, as disclosed in the registration statement for the 1996 Bond Offering, approximately $143.5 million of the 1996 Bond Offering proceeds, together with $34.8 million in then available cash, would be used to:

(i) retire the Old Notes (at a premium of 112.75% of the principal amount, plus accrued interest);

(ii) redeem the outstanding preferred stock from Renco Group, for $8.5 million (the "Stock Redemption");

(iii) pay to Renco Group a $75.7 million dividend (the "1996

Offering Dividend"); and

(iv) make payments of approximately $5.3 million (the "1996

NWAA Payments") to five MagCorp officers under earlier agreements

called "Net Worth Appreciation Participation Agreements" ("NWAP

Agreements").[6]

(The NWAP Agreements, which were apparently entered into some time before 1996,

provided in substance that the MagCorp Officer Defendants were entitled to receive a

fixed percentage of the increase in MagCorp's net worth from August 1, 1996 until the

date of termination of employment.  They also provided that if the company paid any

cash dividend on its common stock, the company would make cash payments to the

MagCorp Officer Defendants.)[7]

Between 1997 and 1998, Renco Group and the Director and Officer Defendants

caused Renco Metals to make several additional dividend payments while the company

allegedly had substantial negative shareholder equity.  Specifically, in 1997—while

Renco Metals had a reported shareholder deficit of $74 million (largely as a result of the

1996 Offering Dividend)—Renco Group caused Renco Metals to pay dividends totaling

$6.6 million, and to make further NWAA Payments to the MagCorp Officer Defendants

of $462,000.  In 1998—while Renco Metals reported a shareholder deficit of $68.9

million—Renco Metals nevertheless made additional dividend payments to Renco Group

totaling $7.2 million and NWAA payments of $504,000 (the "1997-1998 Dividends" and

---

[6]       *See* Amended Complaint ("Cmplt.") ¶ 141.

[7]       *See* Cmplt. ¶ 141.

the "1997-1998 NWAA Payments"). These transactions, like the 1996 dividends and

stock redemption, allegedly were fraudulent conveyances and unlawful dividends.[8]

### D. Activities of Outsider Defendants

The Trustee then generally alleges, before getting to more specific allegations as

to alleged wrongful conduct of each of the Outsider Defendants, that "Defendants"—

without more specificity (and possibly also including Rennert, the Director and Officer

Defendants, and the MagCorp Officer Defendants)—"knew or, absent a reckless

disregard for the truth, should have known," a variety of things about MagCorp's

environmental liabilities, linking that to the preparation of the 1996 Bond Offering

prospectus and other SEC filings,[9] whose disclosures, the Trustee alleges, were "grossly

inadequate."[10] To the same effect, the Trustee alleges that "Defendants" (again without

more specificity) failed to establish or cause to be establish a substantial reserve for

environmental liabilities (presumably in MagCorp's and/or Renco Metals' financial

statements), "leaving [the Debtors] severely exposed and unprepared to contend with any

such environmental exposure."[11]

More specific allegations relating to the alleged wrongful conduct of individual

Defendants follow.

### 1. Houlihan

Defendant Houlihan, the financial advisor in connection with the 1996 Bond

Offering, provided a solvency opinion in which Houlihan opined (subject to

---

[8]     The Stock Redemption, 1996 Offering Dividend, 1996 NWAA Payments, 1997-1998 Dividends,
and 1997-1998 NWAA Payments are collectively referred to as the "Dividend Payments and
Related Transactions."

[9]     *See* Cmplt. ¶ 158.

[10]    Cmplt. ¶ 159.

[11]    Cmplt. ¶ 160.

qualifications in that opinion) that MagCorp and Renco Metals would be able to pay their

debts as they became absolute and mature based on financial forecasts through 2003.

Houlihan's solvency opinion was deficient in a number of respects, including a failure to

address the "obvious fact" that the proposed transactions "actually contemplated that

[Renco] Metals would be left with negative equity, a fact that even the Prospectus

disclosed."[12]  Houlihan did not engage in a required "thorough and rigorous" analysis of

the effect on Renco Metals of the proposed doubling of its long-term debt, along with the

simultaneous transfers in excess of $95 million.[13]

As a result of those and similar allegations, Houlihan allegedly breached its

contract with Renco Metals and MagCorp, aided and abetted one or more fraudulent

conveyances, and aided and abetted other Defendants in the breach of their fiduciary

duties to the Debtors.[14]

### 2.  DLJ

Defendant DLJ, the underwriter for the 1996 Bond Offering, was aware, or should

have been aware through normal due diligence, of the Debtors' environmental liabilities

arising from the operations at the Rowley facility, and that the disclosures made in

connection with the 1996 Offering were grossly inadequate.  DLJ "was in a position to

understand and appreciate" that the environmental liabilities were vastly understated.[15]

And (though this is at least seemingly inconsistent with the foregoing, but is not pleaded

in the alternative), the Trustee further alleges that DLJ failed to perform the type of due

---

[12]     Cmplt. ¶ 242.

[13]     Cmplt. ¶¶ 244-245.

[14]     *See* Cmplt. ¶ 246.

[15]     *See* Cmplt. ¶ 256.

diligence and financial analysis necessary to understand and appreciate the environment liabilities.[16]

Further, "[d]espite DLJ's role as financial advisor to [Renco] Metals," at no time during the 1996 Offering did DLJ advise Renco Metals' Board of Directors that Renco Metals should not refinance the Old Notes and incur additional indebtedness by issuing the New Notes.[17]  Likewise, DLJ should have advised Renco Metals Board that the $75.7 million dividend, the stock redemption and the NWAA Payments constituted fraudulent conveyances, and that they should not be made.[18]

As a result of those and similar allegations, DLJ allegedly breached its contract with Renco Metals and MagCorp, aided and abetted one or more fraudulent conveyances, and aided and abetted other Defendants in the breach of their fiduciary duties to the Debtors.

### 3. *Cadwalader*

Defendant Cadwalader provided legal counsel to Renco Metals prior to 1996 and was retained as legal advisor for the 1996 Bond Offering.  Cadwalader had also represented Rennert and the Rennert Trusts,[19] and Cadwalader continued, in some form, to represent Renco Group, Rennert, Renco Metals, and MagCorp after 1996 (though the nature and substance of this continued representation is not clear from the Complaint).  Throughout the course of Cadwalader's representation of the Debtors, and especially in

---

[16]    Cmplt. ¶ 254.

[17]    Cmplt. ¶ 259.

[18]    *See id.*

[19]    *See* Cmplt. ¶ 264.

-10-

connection with the 1996 Bond Offering, Cadwalader allegedly acted in the best interests of Renco Group and Rennert and to the Debtors' detriment.[20]

Further, Cadwalader undertook fiduciary and professional duties to Renco Metals,[21] which it subsequently breached.  Specifically, Cadwalader "knew or should have known" that:

> (1) it had actual non-waivable conflicts of interest in connection with the 1996 Offering and related dividend and stock redemption transfers;

> (2) the $75.7 million dividend and redemption of the preferred stock were contrary to Renco Metals' interest;

> (3) MagCorp's environmental liabilities were understated on its financials;

> (4) the disclosures in the 1996 Bond Offering prospectus relating to environmental liabilities were inadequate; and

> (5) the Renco Group had intentionally timed the 1996 Bond Offering to coincide with a temporary upswing in magnesium prices so as to give an overly optimistic and misleading view of MagCorp's future success.[22]

As a result, Cadwalader allegedly had a duty to advise Renco Metals against entering into the 1996 Offering, and making the $75.7 million dividend, redeeming its preferred stock, and causing MagCorp to make the NWAA Payments.  Finally,

---

[20]     Cmplt. ¶ 270.

[21]     *See* Cmplt. ¶ 266.

[22]     See Cmplt. ¶ 271.

Cadwalader allegedly assisted Rennert and the other Director and Officer Defendants in breaching their fiduciary duties, and assisted in the fraudulent transfers.[23]

As a result of these and similar allegations, Cadwalader breached its (own) fiduciary duty, was guilty of professional malpractice, aided and abetted breaches of fiduciary duty by Rennert, the Director and Officer Defendants, Renco Group and the other Outsider Defendants, and aided and abetted fraudulent transfers.[24]

### 4. KPMG

KPMG, by reason of "intentional, reckless and/or negligent" failures to properly conduct its audits for the years 1993 through 1999,[25] allegedly breached both professional and contractual obligations, by ignoring Generally Accepted Accounting Principles ("GAAP") and Generally Accepted Auditing Standards ("GAAS") in failing to uncover the Debtors' environmental liabilities and subsequent insolvency after the 1996 Bond Offering and the failure to disclose such in the Debtors' financial statements.

As a result of these and similar allegations, KPMG allegedly breached its contract with Renco Metals and MagCorp, aided and abetted one or more fraudulent conveyances, and aided and abetted other Defendants in their breaches of their fiduciary duties to the Debtors.[26]

### E. Rennert

Defendant Rennert, the Debtors' controlling shareholder and a director and officer of both Debtors, owed fiduciary duties to both Debtor corporations. Rennert allegedly breached such fiduciary duties by, among other things, causing Renco Metals to incur

---

[23]    *See* Cmplt. ¶ 272.

[24]    *See* Cmplt. ¶ 274.

[25]    Cmplt. ¶ 226.

[26]    *See* Cmplt. ¶ 230.

substantial indebtedness—the $150 million from the 1996 Bond Offering—to fund dividend payments and preferred stock redemptions for which he and the Rennert Trusts were the ultimate beneficiaries.[27]  Further, Rennert totally abandoned the Debtors' interests in causing the Debtors to engage in all of the other allegedly fraudulent transfers, including the NWAA payments to MagCorp Officers, the additional dividends paid to the Renco Group, and the release of Sabel Industries from its guarantor obligations under the New Notes.  Rennert knew these transfers would leave the Debtors insolvent, even without giving effect to the undisclosed potential environmental liabilities arising from MagCorp's operations at the Rowley Facility.[28]

Further, at the time of all of these fraudulent transfers, Rennert knew that the Debtors were exposed to the massive potential environmental liabilities.  However, Rennert allegedly concealed these liabilities, thereby permitting himself and other insiders of the corporation to personally profit while the "façade of corporate solvency" remained intact.[29]

## F.  Director and Officer Defendants

The Director and Officer Defendants—Defendants Fay, D'Atri, Sadlowski, and Ryan—as directors and/or officers of the Renco Group as well as officers of Renco Metals and MagCorp—owed fiduciary duties to both Debtors.  The Director and Officer Defendants allegedly breached those duties by, among other things, approving Renco Metals' issuance of the New Notes and the use of the proceeds therefrom to pay substantial dividends to the Renco Group and bonuses to the MagCorp Officer

---

[27]      Cmplt. ¶¶ 275-278.

[28]      Cmplt. ¶¶ 277-287, 290, 295.

[29]      Cmplt. ¶¶ 286, 340-341.

Defendants that left both Debtors insolvent.[30]  Further, the Director and Officer

Defendants knew that the dividends, stock redemption, and NWAA Payments were for

less than reasonably equivalent value or fair consideration, and that the Debtors would be

rendered insolvent by such fraudulent transactions.[31]

Further, the Director and Officer Defendants knew, or absent a reckless disregard

for the truth should have known, that the Debtors' audited financial statements were

misleading and inaccurate because they failed to fully disclose MagCorp's potential

environmental liabilities.[32]  Finally, notwithstanding the effect of these undisclosed

environmental liabilities, the Director and Officer Defendants knew that the fraudulent

insider transfers would by themselves render the Debtors insolvent.[33]

### G.  MagCorp Officer Defendants

The MagCorp Officer Defendants—Defendants Legge, Thayer, Ogaard, Brown,

and Kaplan—were all officers of MagCorp.  As corporate officers, they owed fiduciary

duties to MagCorp.  The Officer Defendants allegedly failed to ensure the accuracy of

MagCorp's reported financial statements, and knew or should have known that the

relevant financial statements failed to reflect the totality of MagCorp's potential

environmental liabilities.[34]  Further, the Officer Defendants knew of the EPA's position

concerning the generation of regulated waste at the Rowley Facility, but nevertheless

failed to ensure compliance with state and federal regulations or to cease operations.[35]

---

[30]        Cmplt. ¶¶ 299-304.

[31]        Cmplt. ¶¶ 309-316.

[32]        Cmplt. ¶ 309.

[33]        Cmplt. ¶ 312.

[34]        Cmplt. ¶¶ 323-324.

[35]        Cmplt. ¶¶ 324-327.

Finally, the MagCorp Officer Defendants allegedly had conflicts of interest by virtue of the NWAA Payments, and did not act in the best interests of the corporation in failing to ensure complete and accurate disclosures of MagCorp's potential environmental liabilities.[36]

### H. Sabel Industries Sale and Release of Sabel Industries Guaranty

On December 4, 2000, Renco Metals sold the stock of Sabel Industries, one of Renco Metals' two subsidiaries and an original guarantor of Renco Metals' obligations under the New Notes, to Defendant Sabel Holdings. Renco Metals received approximately $8 million in cash, net of the outstanding balance owed by Sabel Industries under its revolving credit facility. As part of this sale transaction, Renco Metals released Sabel Industries (the "Sabel Release") from its obligations under the New Notes. This release allegedly was given at a time when both MagCorp and Renco Metals were insolvent and was for less than reasonably equivalent value, and thus allegedly constituted a fraudulent conveyance.

### F. Preference Claims

Finally, within the one-year period preceding the filing of the Debtors' bankruptcy cases (that being the time applicable to preference actions against insiders), when MagCorp was insolvent, MagCorp made at least 15 payments to Renco Group, aggregating approximately $1.3 million, which are allegedly recoverable as preferences.

Similarly, within that same one-year period, Renco Metals made at least 5 payments to Renco Group, aggregating approximately $74,000, which also are allegedly recoverable as preferences.

---

[36]     Cmplt. ¶¶ 330-331.

<u>Discussion</u>

<u>I.</u>

<u>Preliminary Matters</u>

A. *Standards for Application of Rule 12(b)(6)*

The standards for deciding a motion to dismiss are well established. Fed. R. Civ.

P. 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader

is entitled to relief, in order to give the defendant fair notice of what the … claim is and

the grounds upon which it rests."[37] While a complaint attacked by a Rule 12(b)(6)

motion to dismiss does not need detailed factual allegations,[38] a plaintiff's obligation to

provide the grounds for his entitlement to relief "requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do."[39]

Factual allegations must be enough to raise a right to relief "above the speculative

level."[40] But Rule 12(b)(6) "does not countenance … dismissals based on a judge's

disbelief of a complaint's factual allegations."[41] To the contrary, a complaint's factual

allegations are presumed true, and are construed in favor of the pleader.[42] As the

Supreme Court held in *Scheuer v. Rhodes*:

> When a federal court reviews the sufficiency of a
> complaint, before the reception of any evidence
> either by affidavit or admissions, its task is
> necessarily a limited one. The issue is not whether
> a plaintiff will ultimately prevail but whether the

---

[37]     *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1964 (2007) ("*Bell Atlantic*")
(internal quotations omitted), quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957), effectively
overruled in other respects by *Bell Atlantic*.

[38]     *Bell Atlantic*, 127 S.Ct. at 1964.

[39]     *Id*. at 1964-65.

[40]     *Id*. at 1965.

[41]     *Id*. (quoting *Neitzke v. Williams*, 490 U.S. 319, 327 (1989)).

[42]     *See, e.g.*, *Luedke v. Delta Air Lines, Inc.*, 159 B.R. 385, 389 (S.D.N.Y. 1993).

> claimant is entitled to offer evidence to support the
> claims.  Indeed it may appear on the face of the
> pleadings that a recovery is very remote and
> unlikely but that is not the test.[43]

Nevertheless, dismissal can and should be granted if the plaintiff's allegations,

taken as true, along with any inferences that flow from them, are insufficient as a matter

of law.[44]  Once a claim has been stated adequately, it may be supported by showing "any

set of facts consistent with the allegations in the complaint."[45]  Defendants may raise

affirmative defenses on a motion to dismiss.  However, a complaint can be dismissed for

failure to state a claim pursuant to a Rule 12(b)(6) motion raising an affirmative defense

only if the defense appears on the face of the complaint.[46]

### B.  Choice of Law

Renco Metals is a Delaware corporation, as is MagCorp.  Renco Metals' principal

place of business is in New York, and MagCorp's principal place of business is in Utah.

The action was brought in New York.  The Court briefly discusses the law it will be

applying below.

### 1.  Choice of Law—Substantive Law

As to matters relating to the duties of officers and directors to the corporations

they serve—*i.e.*, Renco Metals, and though it is less relevant, MagCorp—and the extent,

if any, to which officers and directors breached them, the Court must apply the law of the

---

[43]     416 U.S. 232, 236 (1974).

[44]     *See, e.g.*, *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993), *cert. denied*, 512 U.S. 1240 (1994)
         (applying the standard discussed above but nevertheless dismissing, where claims for relief were
         legally insufficient).

[45]     *Bell Atlantic*, 127 S.Ct. at 1969.

[46]     *See Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*,
         322 F.3d 147, 158 (2d Cir. 2003) ("*Color Tile*").

state of incorporation, Delaware.  As to claims for *aiding and abetting* breaches of fiduciary duty, by contrast, the choice of law issue is more debatable.

In its decision considering similar contentions in one of the *Adelphia Communications Corporation* cases,[47] this Court discussed the split of authority among New York forum courts considering that issue.[48]  For reasons the Court discussed at greater length in *Adelphia-Bank of America*, normal "interest analysis" principles applicable in all tort cases should apply to claims for aiding and abetting breaches of fiduciary duty, warranting application of the law of the jurisdiction with the greatest interest in a particular case.[49]  In their subsequent decisions in *LaSala* and *Allou Distributors*, Judge Haight of the district court, and Judge Stong of the Eastern District bankruptcy court, came to the same view—citing, *inter alia*, this Court's decision in *Adelphia-Bank of America*.

The Court holds similarly now.  The jurisdiction with the greatest interest is that of the principal place of business, where any injury as a consequence of any aiding and abetting would have been suffered.  For injuries to Renco Metals, that jurisdiction is New York, and the Court will thus apply New York law to the aiding and abetting claims.

### 2.  *Choice of Law—Statute of Limitations*

Conflicts of law issues also exist with respect to application of the various statutes of limitations to the state law claims asserted on behalf of MagCorp.  With respect to the

---

[47]    *See Adelphia Commc'ns Corp. v. Bank of America* (*In re Adelphia Commc'ns Corp.*), 365 B.R. 24, 39-40 (Bankr. S.D.N.Y. 2007) (Gerber, J.) ("*Adelphia-Bank of America*"), *aff'd as to all but an unrelated issue,* 390 B.R. 80 (S.D.N.Y. 2008) (McKenna, J.).

[48]    *Id.* at 39-40; *see also LaSala v. UBS, A.G.*, 510 F. Supp. 2d 213, 230-231 (S.D.N.Y. 2007) (Haight, J.), *O'Connell v. Arthur Andersen LLP* (*In re AlphaStar Ins. Group Ltd.*), 383 B.R. 231, 271-72 (Bankr. S.D.N.Y. 2008) (Bernstein, C.J.) (noting the split); *Silverman v. H.I.L. Associates Ltd.* (*In re Allou Distributors In*c.), 387 B.R. 365, 395-96 (Bankr. E.D.N.Y. 2008) (Stong, J.) (same).

[49]    *See* 365 B.R. at 41.

MagCorp claims, the parties agree that under New York's borrowing statute, the statute

of limitations of Utah—where MagCorp had its principal place of business—will be

determinative.[50]  (The matter of *which* Utah statute of limitations applies is debated,

however—an issue that is discussed below.)

<div align="center">

## II.

Disposition of Motions

</div>

With the preceding analysis by way of background, the Court then turns to the

defendants' motions—first under statutes of limitations, and then on argued substantive

deficiencies or other impediments with respect to the Trustee's Claims.

<div align="center">

## A.

Statute of Limitations Motions

</div>

The Complaint in this adversary proceeding was filed on July 31, 2003.  But in

bringing suit at that time, the Trustee had the benefit of section 108 of the Bankruptcy

Code, which effectively gave the Trustee two more years from the date of the filing of the

Debtors' bankruptcy cases to sue on any claims that were timely on the day the

underlying bankruptcy petition was filed.  These cases were filed on August 2, 2001.

---

[50]     N.Y. C.P.L.R. 202 (McKinney 2003) provides:

> An action based upon a cause of action accruing without the
> state cannot be commenced after the expiration of the time
> limited by the laws of either the state or the place without the
> state where the cause of action accrued, except that where the
> cause of action accrued in favor of a resident of the state the
> time limited by the laws of the state shall apply.

That means, as a practical matter, that where a plaintiff is not a New York resident, the court must
apply the shorter of (1) New York's period of limitations or (2) the statute of limitations
applicable where the cause of action accrued (under the facts here, where the plaintiff resides or is
deemed to reside).  When a bankruptcy trustee sues as a representative of a debtor corporation, the
trustee is deemed to have the residency of the debtor.  In New York, residency is defined as a
corporation's principal place of business.  *See Pereira v. Cogan*, 2001 WL 243537, at *17-18
(S.D.N.Y. Mar. 8, 2001).  Thus, with respect to any MagCorp claims as to which Utah's statute of
limitations would be shorter, the Court must apply the Utah statute.

<div align="center">

-19-

</div>

Thus the Court looks to the extent to which any claims now asserted were untimely, in whole or in part, on the August 2, 2001 date.

That also means that depending on the particular limitations period covering the claim (as potentially relevant here, 3, 4, or 6 years), acts taking place prior to August 2, 1998, 1997, or 1995, respectively, would not provide a basis for recovery, unless the running of the statute of limitations were tolled, or subject to another exception under law.

The 1996 Bond Offering and the issuance of the related dividends took place in July 1996, and the 1997 NWA Payments took place no later than December 1997. As a practical matter, then, some or all of the claims asserted here are untimely unless either a limitations period in excess of three years applies, or there is a tolling of the statute of limitations or another applicable exception.

1.  *MagCorp Claims Against Rennert,*
    *Director and Officer Defendants,*
    *and MagCorp Officer Defendants*
    *(Counts 28, 31-33, 36, 37, 39-41 and 45)*

In Counts 28 and 31-33, the Trustee asserts claims (seemingly on behalf of each of Renco Metals and MagCorp) against Rennert, charging him with negligent representation, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and conspiracy. In Counts 36 and 39-41, the Trustee asserts claims (again seemingly on behalf of each of Renco Metals and MagCorp) against the Director and Officer Defendants and MagCorp Officer Defendants, charging them with negligent misrepresentation, breach of fiduciary duty, aiding and abetting fiduciary duty, and conspiracy. Rennert, the Director and Officer Defendants, and the MagCorp Officer Defendants move to dismiss all of those claims to the extent asserted on behalf of

-20-

MagCorp, arguing that those claims are untimely under applicable statutes of limitations. The Court disagrees.

As noted above, claims asserted here in New York on behalf of MagCorp are untimely if they would be untimely under either of New York's or Utah's statute of limitations.[51]  The Trustee and the moving defendants do not disagree with that.  But they disagree as to (1) *which* Utah limitations period applies, and (2) whether the relevant limitations period should be held to have been tolled.

As to the first issue, those moving defendants argue that the three-year limitations period in Utah Code Ann. § 78-12-27 (1999)[52] applies here, and that as a consequence, all of the Trustee's claims in the Counts listed above are untimely.  The Trustee differs, arguing that § 78-12-27 is not controlling because the statute's terms limit its application to "actions against corporate stockholders or directors."

The Court assumes that in light of the unambiguous language in the Utah statute and the absence of any caselaw clearly supporting a disparate construction, § 78-12-27 is limited to actions against a corporation's directors and shareholders.  But the statute is ambiguous as to whether it also requires that defendants be sued for acts as to which their status as corporate directors or shareholders is an element of the claim, or whether it merely requires that they have committed the allegedly wrongful acts while acting as (or, indeed, simply being) directors or shareholders.  Determination of this latter issue could

---

[51]     In other words, for a non-resident of New York, a restrictive Utah statute of limitations could not be circumvented by bringing suit in New York instead.

[52]     Utah Code Annotated § 78-12-27 (1999) provides, in relevant part:

> Actions against directors or stockholders of a corporation to recover a penalty or forfeiture imposed, or to enforce a liability created, by law must be brought within three years after the discovery, by the aggrieved party, of the facts upon which the penalty or forfeiture attached, or the liability accrued….

affect whether § 78-12-27 covers only claims that would pass muster under the former standard (like Counts 31 and 39, charging breaches of fiduciary duty), or would also cover some or all of the remaining claims that are the subject of this aspect of the Defendants' motions.

However, the Court does not need to decide the latter issue. Assuming, without deciding, that § 78-12-27 has a broader scope (and thus would require a broader array of matters to be brought within three years), its limitations period might still be subject to tolling. The Court must thus decide the second matter as to which the parties disagree.

Under Utah law, the statute of limitations begins to run when the cause of action accrues, which is generally the time when the injury was sustained, or the "happening of the last event necessary to complete the cause of action."[53] Mere ignorance of the facts that give rise to a cause of action will not excuse a plaintiff's failure to make a timely claim.[54]

But the Trustee argues that the "exceptional circumstances" prong of the discovery rule is applicable on these facts to toll the limitations period. The Court agrees. In Utah, there are two types of discovery tolls—statutory and equitable. A statutory discovery rule only exists when the relevant statute of limitations mandates that the limitations period does not begin to run until the aggrieved party discovers the facts upon which the action accrued.[55] In contrast, the equitable discovery rule has a more narrow application when the relevant statute of limitations does not include such an internal statutory discovery rule.

---

[53]    *Myers v. McDonald*, 635 P.2d 84, 86 (Utah 1981)

[54]    *See id*.

[55]    *See, e.g.*, § 78-12-27.

In *Russell Packard Dev., Inc. v. Carson,* the Utah Supreme Court limited the circumstances when the equitable discovery rule will permit the tolling of an otherwise fixed statutory limitations period to the following two situations:

> (1) where a plaintiff does not become aware of the cause of action because of the defendant's concealment or misleading conduct, and (2) where the case presents exceptional circumstances and the application of the general rule would be irrational or unjust, regardless of any showing that the defendant has prevented the discovery of the cause of action.[56]

Here, the Trustee seeks application of the latter prong of the equitable discovery toll. Utah courts, in applying the exceptional circumstances prong of the equitable discovery rule, require a two-part showing. First, the plaintiff must demonstrate that it did not know of—and could not reasonably have known of—the existence of the cause of action in time to file a claim within the limitations period. If this threshold showing is made, the court then undertakes a balancing test to determine whether there are exceptional circumstances that render application of the limitations period irrational or unjust.[57]

As to the threshold issue, the Trustee alleges that *all* of MagCorp's officers and directors were culpable in the alleged fraudulent transfers and public misrepresentations and remained in corporate control until the limitations period expired. Therefore, the argument continues, absent an innocent member of management, the Debtors could not have "known" of the existence of their causes of action until an empowered outsider was

---

[56]   108 P.3d 741,747 (Utah 2005) (internal quotations omitted).

[57]   *See Macris v. Sculptured Software, Inc.*, 24 P.3d 984, 990 (Utah 2001). *See also Ockey v. Lehmer*, 189 P.3d 51, 60 (Utah 2008).

-23-

brought in.  The empowered outsider—here the Trustee—was not appointed until April

14, 2003, after the limitations periods would expire in the absence of tolling.

In considering the application of the statutory discovery rule in § 78-12-27, the

Utah Supreme Court has explained how a corporation "discovers" wrongdoing by its own

insiders for the purposes of tolling the statute of limitations:

> A corporation discovers wrongdoing by its officers,
> directors or controlling shareholders *through*
> *outside shareholders or independent directors.*
> "Discovery" of breach of fiduciary duty thus has
> two components: The shareholders or directors must
> have knowledge of the wrongdoing or facts that put
> them on inquiry and must be *sufficiently*
> *independent* to be able to assert a claim on behalf of
> the corporation.[58]

This test is not easily satisfied, as a "plaintiff must allege and show full, complete,

and exclusive control of the corporation by the wrongdoers so that the possibility that an

informed stockholder or director could have induced the corporation to sue is negated."[59]

Though the court in *United Park City* was interpreting the discovery rule within § 78-12-

27, this Court believes the *United Park City* analysis is also instructive for the inquiry of

when a corporation gains sufficient knowledge of the existence of a cause of action under

the equitable tolling doctrine.  As explained above, the Trustee alleges that all of the

Debtors' responsible agents, including their ultimate sole shareholder Renco Group

(controlled by Rennert), were culpable in the wrongs asserted, and that Rennert was the

principal architect of the alleged scheme to fraudulently dissipate the Debtors' assets.

Allegations of this character, if proven, would satisfy the standards articulated in *Utah*

---

[58]    *United Park City Mines Co. v. Greater Park City Co., 870 P.2d 880, 885 (Utah 1993) (emphasis
added) ("United Park City").*

[59]    *Id.* at 885-86.

*Park City*.  Accordingly, the Trustee's allegations satisfy the first prong of the exceptional circumstances inquiry.[60]

The second prong of Utah's exceptional circumstances analysis requires the Court to balance the plaintiff's burden of working within the limitations period against the prejudice to the defendant from letting the action proceed after such period has passed. Factors a court can consider in applying this balancing test include whether and to what extent the passage of time prejudices either party's case, and whether the claim has aged to the point that witnesses cannot be located, evidence cannot be found, and the parties cannot remember basic events.[61]  Here none of these factors requires a dismissal of the action.  On a motion to dismiss—accepting all of the Trustee's allegations as true—the balancing test weighs in favor of the Trustee.  Accordingly, tolling may be possible here, and the motion to dismiss MagCorp's claims in Counts 28, 31-33, 36-37, 39-41 and 45 of the Complaint as untimely is denied.

2.  *Claims Against Outsider Defendants*

Each of the Outsider Defendants likewise moves for dismissal under applicable statutes of limitations.  The Court then turns to those motions.

---

[60]    While the holding in *United Park City* is merely instructive as to the equitable tolling analysis, it is directly applicable to the statutory discovery rule in § 78-12-27 for the causes of action asserted against Rennert and Renco Group.  As detailed in *United Park City*, a corporation does not "discover" wrongdoing by its own insiders until such knowledge is acquired by individuals who are sufficiently independent to assert a claim on behalf of the corporation.  In the instant case, the Trustee alleges that did not occur until his appointment in 2003.  Accordingly, the discovery rule in § 78-12-27 tolls the limitations period for Counts 28, 31-33, and 45 until 2003.

[61]    *See Sevy v. Security Tile Co. of S. Utah*, 902 P.2d 629, 636 (Utah 1995).

     *a. Cadwalader*
       *(Counts 22-27)*[62]

In Counts 22 through 27, the Trustee asserts claims against Cadwalader,

apparently on behalf of Renco Metals alone, for negligence and professional malpractice,

negligent misrepresentation, aiding and abetting fraudulent conveyances, breach of

fiduciary duty, aiding and abetting breaches of fiduciary duty, and conspiracy,

respectively. Cadwalader moves to dismiss all of them as untimely.

As these are claims on behalf of Renco Metals, whose principal place of business

was in New York, the parties seem to agree that New York's statute of limitations

applies. But the parties disagree on the applicable New York CPLR ("CPLR") provision

to be applied: (a) the three-year period in CPLR 214(6),[63] for actions based on non-

medical professional malpractice, or (b) the six-year limitations period in CPLR 213(1),[64]

applicable to actions for which no other limitations period is prescribed.

Cadwalader argues that whatever those claims are called, they sound in

malpractice (as they arise from the same facts), and thus that the three-year period of

CPLR 214(6) applies, and that the claims are thus untimely. Presumably because CPLR

214(6) applies "regardless of whether the underlying theory is based in contract or in

---

[62]      Cadwalader, like all of the other defendants, is also named in Count 51, charged with violations of Del. Gen. Corp. L. § 170, and seeks to dismiss that as well as untimely. But as that claim is so plainly deficient as against the Outsider Defendants (and, indeed, most of the others as well (see page 75 et seq. below)), the Court does not need to address the application of the statute of limitations to Count 51, insofar as Count 51 is asserted against them.

[63]      N.Y. C.P.L.R. § 214 (McKinney 2003) provides, in relevant part:

        The following actions must be commenced within three years:
        … (6) an action to recover damages for malpractice, other than
        medical, dental or podiatric malpractice, regardless of whether
        the underlying theory is based in contract or tort.

[64]      N.Y. C.P.L.R. § 213 (McKinney 2003) provides, in relevant part:

        The following actions must be commenced within six years:
        … (1) an action for which no limitation is specifically
        prescribed by law.

tort," the Trustee appears to concede that CPLR 214(6) applies to most of those claims. However, he differs with respect to Count 24 (aiding and abetting fraudulent conveyance), and Count 25 (charging Cadwalader with breach of fiduciary duty), arguing in each case that they fall outside the purview of CPLR 214(6)—and thus that a different statute of limitations, the catch-all provision, CPLR 213 (with its six year limitations period), applies to those claims. More importantly, the Trustee argues that in any event, all statutes of limitations otherwise applicable to Cadwalader are tolled, by reason of the "continuous representation doctrine" and equitable tolling.

> *(i) Scope of CPLR 214(6)*

The Court rules that the three-year period of CPLR 214(6) applies to all of Counts 22 through 27.

First, with respect to the "purview" of CPLR 214(6), the Court rejects the Trustee's contentions. To the extent, if any, to which aiding and abetting a fraudulent conveyance is actionable, when that is done by reason of nothing more than providing the services that lawyers provide, it is not unlike malpractice, or the other claims as to which the Trustee does not challenge CPLR 214's application.

That similarly is the case with respect to the breach of fiduciary duty claim on the allegations here—where the claim is not, by way of example, that the lawyer stole from his client or absconded with funds in his trust account, but rather failed to stop his client from doing something improper. The Court then turns to the Trustee's principal point, a contention that the longer period of CPLR 213 should apply to the breach of fiduciary duty claim, because claims of that character should regarded as "equitable." As articulated by the Second Circuit, in New York a "a prayer for equitable relief will not

bring an action under the longer limitations period for equity actions when full relief can be granted at law."[65]  Whether a plaintiff has an adequate remedy at law is a threshold matter that the plaintiff must establish before a court can apply the longer limitations period applicable for actions in equity.[66]  In determining which limitations period to apply, the essence of an action and the facts that underlie it—as opposed to the label assigned to it by the plaintiff—are dispositive.[67]

To the extent Cadwalader is liable to the Trustee for a breach of fiduciary duty, money damages—a remedy at law—would be sufficient to satisfy the relief requested. Additionally, the claim for breach of fiduciary duty relies on nearly identical facts to those underlying the other malpractice and negligence claims—claims that seek solely legal remedies.

The Trustee argues, nevertheless, that its request for a constructive trust requires application of the longer limitations period.  The Court disagrees.  In *Great-West Life & Annuity Insurance Company v. Knudson*,[68] the Supreme Court stated that "for restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff *particular funds or property in the defendant's possession*."[69]

---

[65]    *Klein v. Bower*, 421 F.2d 338, 344 (2d Cir. 1970).

[66]    *See, e.g.*, *LaSala v. Needham & Co., Inc.*, 2006 WL 452024, at *6 (S.D.N.Y. Feb. 24, 2006) ("Any plaintiff seeking equitable relief must establish as a threshold matter that he has no adequate remedy at law.").

[67]    *See De Carlo v. Ratner*, 204 F. Supp. 2d 630, 637-38 (S.D.N.Y. 2002) *aff'd* 53 F. App'x 161 (2d Cir. 2002).

[68]    534 U.S. 204 (2002) ("*Great-West*").

[69]    *Id.* at 214 (emphasis added).

-28-

The Second Circuit has since applied *Great-West* to facts similar to those presented here—a trustee suing for breach of fiduciary duty. In *Pereira v. Farace,*[70] the bankruptcy trustee of Trace International Holding, Inc. ("Trace") sued several former officers and directors of Trace for breach of fiduciary duty under Delaware state law. The trustee asserted various claims for monetary damages, including for amounts improperly transferred by Trace while under the defendants' management. The Second Circuit, like its sister courts, read *Great-West* to require the defendants to possess the funds in issue in order to permit an action to lie in equity.[71] Because the trustee's claim was for compensatory damages—rather than the return of any particular property in the defendants' possession—the Second Circuit found the trustee's suit to be legal in nature.[72]

Here, the Trustee is seeking to recover fees and other compensation paid to Cadwalader, and actual and consequential damages from the alleged breach of fiduciary duty. This relief is nearly identical to that sought in *Pereira*. And as explained by *Great-West*, compensatory money damages—which is what the Trustee seeks here—is "the classic form of legal relief."[73] Accordingly, the Trustee's claim for breach of fiduciary is for compensatory legal relief, and is thus subject to the three-year limitations period found in CPLR § 214(6), subject to any tolling or other doctrine that might excuse the Trustee from the limitations period for which CPLR § 214(6) would otherwise provide.

---

[70]   413 F.3d 330, 335-337 (2d Cir. 2005).

[71]   *Id.* at 340.

[72]   *Id.*

[73]   *Great-West*, 534 U.S. at 210; *see also Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 477 (1962) ("[W]e think it plain that [a] claim for a money judgment is a claim wholly legal in its nature however the complaint is construed.").

*(ii) Doctrines Extending Statute of Limitations*

The Court then turns to issues of tolling or other doctrine that might effectively extend the limitations period beyond the three years that otherwise would apply. Cadwalader is charged with misconduct in connection with the 1996 Bond Offering and the subsequent dividend and other payments. The Trustee's causes of action accrued in or around July 1996, and in the absence of tolling or other doctrine that might excuse late filing, were untimely when the Debtors' chapter 11 cases were commenced in 2001. But the Trustee principally advances two argued reasons by which Counts 22, 23, 25, and 26 would nevertheless be timely, contending that the limitations period was tolled by either the "continuous representation doctrine" or equitable estoppel. The Court cannot agree.

The continuous representation doctrine in New York has its jurisprudential beginnings in the medical malpractice field, originating in the case of *Borgia v. City of New York*.[74] The doctrine has since been extended beyond medical professionals to lawyers, architects, and accountants (among others).[75] To invoke the continuous representation doctrine, a plaintiff must satisfy a two-pronged test demonstrating "(1) ongoing representation connected to the specific matter at issue in the malpractice action, and (2) clear indicia of an ongoing, continuous, developing and dependent relationship between the client and the attorney."[76] If this showing is made, the limitations period will be tolled until the ongoing representation is completed. However, "New York Courts have repeatedly held that the doctrine is strictly limited to instances

---

[74]    12 N.Y.2d 151 (1962).

[75]    *See Tool v. Boutelle*, 398 N.Y.S.2d 128, 129-130 (N.Y. Sup. Ct. Albany County 1977).

[76]    *See De Carlo*, 204 F. Supp. 2d at 636 (quotation omitted).

where the *continuing representation pertains specifically to the matter in dispute*, and is not applicable where an attorney provides ongoing general representation."[77]

The Trustee has failed to allege facts demonstrating that Cadwalader's representation of the Debtors after the 1996 Bond Offering and related dividends had the requisite subject matter specific nexus to the services it provided in 1996.[78]  Though the Complaint includes perfunctory statements that Cadwalader's representation continued in some unspecified capacity,[79] there are no allegations as to the substance of those representations. Moreover, the *specific transactions* that the Trustee cites as evidence of Cadwalader's misconduct—the 1996 Bond Offering, the $8.5 million Stock Redemption, and the $5.3 million 1996 NWAA Payment—*all* occurred in 1996.  Accordingly, the continuous representation doctrine cannot be invoked on these facts.

The Trustee also argues that equitable estoppel prevents Cadwalader from asserting the statute of limitations defense.  Equitable estoppel represents the axiomatic judicial principle that no litigant "may take advantage of his own wrong."[80]  A litigant can be equitably estopped from interposing a statute of limitations defense where the opposing party "was induced by fraud, misrepresentations or deception to refrain from

---

[77]     *Mason Tenders Dist. Council Pension Fund v. Messera*, 958 F. Supp. 869, 889 (S.D.N.Y. 1997) (emphasis added).

[78]     The Trustee alleges that Cadwalader advised the Debtors on the NWAA Payments, but the Court cannot discern which NWAA Payments the Trustee is referring to and when Cadwalader rendered the relevant legal services.  The NWAA Payments also are distinct from the dividends and stock redemption payments.  No year is mentioned beyond 1996 in the sections of the Complaint devoted to Cadwalader.  *See* Cmplt. ¶¶ 264-274.  Furthermore, where the Trustee refers to specific NWAA Payments in connection with Cadwalader, it is always the $5.3 million payment made in 1996.  *See, e.g.*, Cmplt. ¶ 493.

[79]     Cmplt. ¶ 12 ("Cadwalader represented [Renco] Metals as legal advisor in connection with the 1996 Offering and before and after the 1996 Offering.").

[80]     *Glus v. Brooklyn E. Dist. Terminal*, 359 U.S. 231, 232 (1959).

-31-

filing a timely action."[81]   However, to invoke equitable estoppel, the Trustee must

"establish that *subsequent and specific* actions by [the] defendants somehow kept [him]

from timely bringing suit."[82]   New York courts have consistently held that "equitable

estoppel does not apply where the misrepresentation or act of concealment underlying the

estoppel claim is the same act which forms the basis of [the] plaintiff's underlying

substantive cause[s] of action."[83]

   The Trustee fails to allege any subsequent or specific acts of misrepresentation or

concealment on Cadwalader's part, especially any separate and apart from those that

constitute the elements of the underlying causes of action.   While the law holds

fiduciaries to a higher standard in this regard,[84] courts have consistently held that silence

is not sufficient to invoke equitable estoppel.[85]   Rather, to invoke equitable estoppel, the

Trustee must allege at least some facts that raise the inference that Cadwalader concealed

an earlier wrongdoing, or committed some affirmative act beyond the initial wrongdoing,

to prevent the Trustee from bringing timely suit.[86]

---

[81]   *Simcuski v. Saeli*, 44 N.Y.2d 442, 448-49 (1978).

[82]   *Zumpano v. Quinn*, 6 N.Y.3d 666, 674 (2006) (emphasis added).

[83]   *Kaufman v. Cohen*, 307 A.D.2d 113, 122, 760 N.Y.S.2d 157 (1st Dep't 2003); *see also Tenamee v. Schmukler*, 438 F. Supp. 2d 438, 445 (S.D.N.Y. 2006) ("New York law is clear that the same act of non-disclosure cannot underlie both the argument for estoppel and the related cause of action.").

[84]   *See Doe v. Holy See (State of Vatican City)*, 17 A.D.3d 793, 795, 793 N.Y.S.2d 565 (3d Dep't 2005) ("[C]oncealment without actual misrepresentation may form the basis for invocation of the doctrine if there was a fiduciary relationship which gave [the] defendant an obligation to inform [the] plaintiff of facts underlying the claim.") (citations and quotations omitted).

[85]   *See Abercrombie v. Andrew College*, 438 F. Supp. 2d 243, 265-66 (S.D.N.Y. 2006); *Tenamee*, 438 F. Supp. 2d at 445 ("Moreover, in order to demonstrate a basis for the application of equitable estoppel, a plaintiff must allege more than that the defendant remained silent regarding the initial wrong.").

[86]   *See Tenamee*, 438 F. Supp. 2d at 445 ("Rather, equitable estoppel applies only when a defendant covers up an earlier wrongdoing to prevent plaintiff from suing on the initial wrong.").

Contrary to the Trustee's assertions, courts have considered equitable estoppel on a motion to dismiss.[87]   And as illustrated above, the Trustee failed to plead an essential element of equitable estoppel—concealment or misrepresentations on Cadwalader's part separate and apart from the facts constituting the underlying causes of action.   Equitable estoppel is therefore inapplicable on these facts.

If the Court were to limit the Trustee to the allegations that he made in the Complaint with respect to Cadwalader, and the arguments the Trustee made in his briefs, that would be the end of the matter.   But there is a legal doctrine distinct from those addressed above, not expressly pleaded or argued here, that could be applicable here, with respect to the aiding and abetting claims.   In its decision in *Adelphia-Bank of America*,[88] this Court considered an alternative basis for tolling, the "adverse domination doctrine," under Pennsylvania law, under which the statute of limitations could be tolled for as long as a corporate plaintiff is controlled by the alleged wrongdoers.[89] Pennsylvania's adverse domination doctrine is based on recognition of the fact that if a corporation can act only through the controlling wrongdoers, it cannot reasonably be expected to pursue a claim which it has against those wrongdoers until they are no longer in control.   And this Court held in *Adelphia-Bank of America* that a corporation likewise

---

[87]   *See Abercrombie v. Andrew College*, 438 F. Supp. 2d at 265-66 (dismissing cause of action because plaintiff failed to identify facts of fraudulent concealment other than those pertinent to the underlying cause of action that would invoke equitable estoppel); *Dep't of Econ. Dev. v. Arthur Andersen & Co. (USA)*, 747 F. Supp. 922, 943 (S.D.N.Y. 1990) (dismissing cause of action because plaintiff made no allegation in complaint that "its failure to timely institute its third-party action was due to its justified reliance upon a misrepresentation" by opposing party); *Moll v. U.S. Life Title Ins. Co. of N.Y.*, 700 F. Supp. 1284, 1293 (S.D.N.Y. 1988) ("Plaintiffs have not alleged that defendant caused them to delay in bringing suit on a known cause of action. On the contrary, plaintiffs repeatedly emphasize that they did not discover the alleged ... violations until long after the limitations period had expired. Equitable estoppel is therefore not appropriate in this case.").

[88]   *See* n.47 *infra*.

[89]   *See* 365 B.R. at 58-59, discussing *RTC v. Farmer*, 865 F.Supp. 1143, 1151 (E.D. Pa. 1994).

-33-

could not reasonably be expected to pursue a claim against those who *aided and abetted*

the controlling wrongdoers, or acted in concert with them, until the controlling

wrongdoers were no longer in control.

Here the Trustee has made somewhat similar allegations with respect to the

MagCorp claims against Renco Group, Rennert, the Director and Officer Defendants and

the MagCorp Officer Defendants, discussed above in the context of Utah's "exceptional

circumstances" doctrine.  And it would not be too much of a jump for the Trustee to

allege that the insiders could not reasonably be expected to pursue a claim for aiding and

abetting their own wrongful conduct.  But the Trustee has failed to allege facts sufficient

to draw an inference with respect to any motivation of Renco Metals' to refrain from

suing *Outsider Defendants*, like Cadwalader, for claims *other than* aiding and abetting.

As importantly or more so, the Trustee has failed to provide the Court with any authority

upon which the Court might find and apply an "adverse domination" doctrine, or the

functional equivalent, under New York (as contrasted to Pennsylvania) law, with respect

to the aiding and abetting claims or any others.  Under these circumstances, Cadwalader's

motion to dismiss Counts 22 through 27 of the Complaint as untimely is granted.[90]

### b.  KPMG
### (Counts 1-7)

In Counts 1 through 7, the Trustee asserts causes of action against KPMG,

apparently on behalf of each of Renco Metals and MagCorp, for breach of contract,

---

[90]    In light of the possibility that with repleading and suitable briefing, the deficiencies noted above
might be cured, the Court has considered whether leave to replead should be granted.  For reasons
discussed below, the Trustee's claims against Cadwalader and the other Outsider Defendants must
be dismissed on other grounds as well.  Thus, granting leave to replead would be futile, and the
Court further notes that the Trustee has already amended his complaint once.  Thus the Court
denies leave to replead at this time.  If, however, the alternative bases for dismissal, as described
below, are hereafter held to be erroneous with the result that these claims can be asserted on their
merits, leave to replead is granted.

negligence/professional malpractice, negligent misrepresentation, aiding and abetting
fraudulent conveyance, breach of fiduciary duty, aiding and abetting breach of fiduciary
duty, and conspiracy, respectively.  (The claims against KPMG relate to the fiscal years
ended 1993-1999, with the audit work having been performed in the months just
following the end of each of those years.)  KPMG moves to dismiss those claims insofar
as they relate to the audits for the 1997 and earlier fiscal years—arguing that the three
year statute of limitations applicable to non-medical malpractice claims applies, and that
suit for those years should have been brought no later than January 2001.

Plainly, KPMG is a covered professional under CPLR 214(6), and equally plainly,
CPLR 214(6)'s 3-year limitations period is applicable to the breach of contract,
negligence/professional malpractice, and negligent misrepresentation claims.  And as
above, the Trustee does not dispute that the claims for aiding and abetting breach of
fiduciary duty and conspiracy are covered under CPLR 214(6)—and  the Court concludes
that they are indeed covered, since CPLR 214(6) applies to claims "regardless of whether
the underlying theory is based in contract or in tort."  Thus the claims against KPMG are
barred to the extent that they arose prior to August 2, 1998 (3 years before August 2,
2001) unless the running of the statute of limitations was tolled, or subject to another
exception under law.

However, the Trustee argues that the statute of limitations with respect to his
claims against KPMG was indeed tolled, under the continuous representation doctrine.
This argument presents issues analogous in concept to those addressed in connection with
the application of the continuous representation doctrine to Cadwalader, but that are
distinct in application from those applicable to a law firm.

-35-

The continuous representation doctrine has been applied in New York caselaw to claims against accountants.[91]  Invocation of the continuous representation doctrine will toll the limitations period for an action where a party can satisfy a two-pronged test demonstrating "(1) ongoing representation connected to the specific matter at issue in the malpractice action, and (2) clear indicia of an ongoing, continuous, developing and dependent relationship…."[92]  As with Cadwalader, application of the continuous representation doctrine here turns on whether the specific subject matter requirement of the first prong has been met.  The mere recurrence of professional services or the continued existence of a general accountant-client relationship will not suffice.  Instead, the doctrine applies only to claims arise from the uninterrupted rendering of professional services on a particular disputed matter.[93]

Applied here, the question then is whether KPMG's consecutive annual engagements to review and audit the Debtors' year-end financial statements relate to the same specific subject matter.  While some courts (outside of this jurisdiction) have held that consecutive annual auditing engagements do not relate to the same specific subject matter, and thus have found the doctrine inapplicable,[94] other courts, interpreting New York law (including Judge Lifland of this Court, involving similar claims against an

---

[91]   *See Wilkin v. Dana R. Pickup & Co.*, 347 N.Y.S.2d 122, 125 (N.Y. Sup. Ct. Allegany County 1973) ("This Court deems the language of [*Borgia* and progeny] to be broad enough to relate to other professions of a confidential complex relationship such as the profession of certified public accounting.").

[92]   *See De Carlo*, 204 F. Supp. 2d at 636 (quotations omitted).

[93]   *See Mason Tenders Dist. Council Pension Fund*, 958 F. Supp. at 889; *In re Investors Funding Corp. of New York*, 523 F. Supp. 533, 547-48 (S.D.N.Y. 1980).

[94]   *See, e.g., F.D.I.C. v. Deloitte & Touche*, 834 F. Supp. 1129, 1149 (E.D. Ark. 1992) ("[T]he Complaint merely describes a general and ongoing accountant-client relationship. If the continuous treatment doctrine applied under the alleged facts of this case, it almost certainly would apply in every case involving an accountant that had performed audits for a client in consecutive years."); *Lincoln Grain, Inc. v. Coopers & Lybrand*, 215 Neb. 289 (1983).

accountant), have held that where an accountant commits a particular form of malpractice in the course of preparing several year-end financial statements, the continuous representation doctrine tolls the limitations period for this specific species of malpractice until the accountant ceases to provide the client with those services.[95]  For obvious reasons, this Court follows the New York authority.

The Trustee alleges that KPMG failed to adequately investigate "and properly report" the environmental liabilities, known and potential, for environmental and remediation costs.[96]  The Trustee contends that KPMG repeatedly undertook to audit the Debtors' financial statements, and repeated the same alleged failures of duty in the course of preparing each year-end audit for fiscal years 1993 through 1999.[97]  Though they have serious substantive deficiencies (discussed below), these allegations, if proven, could warrant invocation of the continuous representation doctrine.  Similarly, the Complaint raises the inference that each annual audit built upon and incorporated information from prior audits—potentially providing an additional ground for invoking the continuous representation doctrine, and thus making dismissal on motion inappropriate.[98]

---

[95]    *In re CBI Holdings, Inc.*, 247 B.R. 341, 368 (Bankr. S.D.N.Y. 2000) ("*CBI-Bankruptcy*"), *aff'd in part and rev'd in part on other grounds*, 311 B.R. 350 (S.D.N.Y. 2004), *aff'd in part and rev'd in part on reh'g*, 311 B.R. 350 (S.D.N.Y. 2004), *aff'd in part and rev'd in part on other grounds*, 529 F.3d 432 (2d Cir. 2008) ("E & Y failed to perform a proper search for unrecorded liabilities in respect of the 1992 audit and again failed to perform a proper search for unrecorded liabilities in respect of the 1993 audit.  Because the evidence demonstrates that there was a particular form of malpractice that occurred in 1992 and again in 1993, the statute of limitations for the 1992 misconduct is tolled until such time as E & Y stopped rendering services to CBI, which would have been in 1994."); *Ackerman v. Price Waterhouse*, 252 A.D.2d 179, 205, 683 N.Y.S.2d 179 (1st Dep't 1998) ("The Ackerman plaintiffs provided ample evidence supporting the application of continuous representation, including the repeated use of an improper accounting method and the repeated failure to disclose the risks associated with the same.").

[96]    Cmplt. ¶ 201.  If it matters, both sides' rights to address the nature of an accountant's duty when reporting on its client's financial statements will be reserved.

[97]    *Id.* ¶¶ 197, 202-207.

[98]    *See In re Investors Funding Corp.*, 523 F. Supp. at 548 ("In any event, the Court concludes that resolution of [the continuous representation doctrine] issue in the context of a motion purportedly

Application of the continuous representation doctrine would toll the limitations period until as late as January 2000, when KPMG reported on the Debtors' 1999 audited financial statements. All of the actions against KPMG were thus timely when the Debtors chapter 11 cases were filed in 2001. Accordingly, KPMG's motion to dismiss on statute of limitations grounds is denied.

### c. Houlihan (Counts 15-21)

In Counts 15 through 21, the Trustee asserts claims, apparently on behalf of Renco Metals alone, against Houlihan for breach of contract, negligence, negligent misrepresentation, breach of fiduciary duty, aiding and abetting fraudulent conveyances, aiding and abetting breaches of fiduciary duty, and conspiracy, respectively. Houlihan moves to dismiss those claims as untimely.

The Trustee argues that his claims against Houlihan, and particularly his breach of contract claim, are timely under the six-year limitations period in CPLR 213(2).[99] Houlihan argues, however, that CPLR 213(2) does not apply here, as Houlihan is a "professional" within the meaning of CPLR 214(6), which, as noted above, prescribes a 3-year limitations prescribed for non-medical professional malpractice. The Court cannot endorse Houlihan's argument. Whatever other defenses Houlihan may have, it is not a "professional" within the meaning of CPLR 214(6), and may not rely on the shorter statute of limitations for professionals so covered.

---

directed at the face of the pleadings would be premature, for the parties in their submissions have evidenced that there are disputed factual issues, for example, as to the independence of each annual audit from prior annual audits.").

[99]   N.Y. C.P.L.R § 213(2) (McKinney 2003) provides, in relevant part:

The following actions must be commenced within six years:
… 2. an action upon a contractual obligation or liability, express or implied, except as provided in section two hundred thirteen-a of this article or article 2 of the uniform commercial code or article 36-B of the general business law.

In *Chase Scientific Research, Inc. v. NIA Group, Inc.*,[100] the New York Court of Appeals declined to find the shorter statute of limitations of CPLR 214(6) to be applicable to malpractice claims against an insurance broker.  In doing so, it provided extensive guidance as to who should be deemed to be a "professional" for application of CPLR 214(6) to non-medical malpractice claims.[101]  As the *Chase Scientific Research* court recognized, CPLR 214(6) was amended in 1996 to address the hybrid nature of professional malpractice claims (and that such could be deemed to sound in contract, negligence, or both), and to clarify that however such claims were characterized, they should be subject to a shortened 3-year statute.[102]  But as that court likewise recognized, CPLR 214(6) did not list the types of professionals it covered.[103]

In deciding who was covered, the *Chase Scientific Research* court noted that a report of the New York State Bar Association, issued when CPLR 214(6) was up for amendment, referred to architects, engineers, lawyers and accountants as the types of professionals that would be covered.[104]  The *Chase Scientific Research* court further noted that "qualities shared by such groups guide us in defining the term 'professional.'"[105]  In that connection, the court stated that:

> In particular, those qualities include extensive formal learning and training, licensure and regulation indicating a qualification to practice, a code of conduct imposing standards beyond those accepted in the marketplace and a system of discipline for violation of those standards....

---

[100]   96 N.Y.2d 20 (2001).

[101]   *Id.*

[102]   *Id.* at 27.

[103]   *Id.* at 25.

[104]   *Id.* at 29.

[105]   *Id.*

> Additionally, a professional relationship is one of
> trust and confidence, carrying with it a duty to
> counsel and advise clients…[106]

Similarly, the *Chase Scientific Research* court observed, with respect to the

standards for the definition of a professional under CPLR 214(6), noted above, that:

> This definition, we believe, implements the
> Legislature's intention to benefit a discrete group of
> persons affected by the concerns that motivated the
> shortened statute of limitations…. We are mindful
> as well that our definition ideally should establish a
> bright line, so that, absent legislative clarification, it
> can be fairly and uniformly applied.  Moreover,
> with the rise of large numbers of skilled "semi-
> professions," … any broader definition would, for
> the future, make it hard to draw meaningful
> distinctions and the groups covered by CPLR
> 214(6) would quickly proliferate.[107]

Thus, recognizing that "professional" is a term in wide usage, commonly

understood to have several meanings,[108] the *Chase Scientific Research* court rejected a

broad definition for "professional."  It stated that:

> [N]either common parlance nor licensure can
> determine the meaning of "professional," for surely
> the Legislature did not have such a vast, amorphous
> category of service providers in mind when it
> amended CPLR 214(6).[109]

And it went on to approvingly quote Alexander's Practice Commentary to CPLR 214(6),

which observed that

> The Legislature presumably sought to confer the
> protections of CPLR 214 (6) *on a relatively small
> group of defendants.*  Otherwise, it would have

---

[106]    *Id.* (citations omitted).

[107]    *Id.* at 29.

[108]    *See id.* at 28.

[109]    *Id.*

-40-

> shortened the six-year breach of contract period to
> three years for all contracts for services.[110]

Applying these standards, this Court rules that Houlihan does not qualify as a professional within the meaning of CPLR 214(6).  Houlihan contends that all of its financial advisors must take an exam administered by the National Association of Securities Dealers ("NASD") and that these advisors are subject to continuing educational requirements imposed by the NASD.  This form of licensing and regulation would possibly satisfy at least one of the *Chase Scientific Research* factors.  However, the other factors, including extensive formal education, an internal code of conduct and self-regulated disciplinary system, are all absent, at least when compared to those for architects, engineers, lawyers and accountants.  And in applying those factors, the Court must be mindful of the Chase Scientific Research court's several stated reservations as to applying "professional" too broadly.

The Court thus rules that CPLR 214(6) does not apply to Houlihan.  As Houlihan has not contended that claims against it would be untimely under any otherwise applicable statute of limitations, Houlihan's motion to dismiss, insofar as based on the statute of limitations, is denied.

### d. DLJ (Counts 8-14, 51)

In Counts 8 through 14, the Trustee asserts claims against DLJ, apparently on behalf of Renco Metals,[111] for breach of contract, negligence, negligent misrepresentation, aiding and abetting fraudulent conveyances, breach of fiduciary duty,

---

[110]     *Id.* (emphasis added).

[111]     Counts 9, 10 and 11 make reference only to acts on behalf of (Renco) Metals and duties to that entity.  Count 13 does not speak of any particular acts or duties in favor of either of the Debtors.  Neither side argues for the application of Utah's statute of limitations, or the statute of limitations law of any jurisdiction other than New York's.

aiding and abetting others' breaches of fiduciary duty and conspiracy, respectively.  DLJ
moves to dismiss Counts 9 (negligence), 10 (negligent misrepresentation), 12 (breach of
fiduciary duty) and 13 (aiding and abetting breaches of fiduciary duty) as untimely.

Unlike the other Outsider Defendants, DLJ (which was the underwriter for the
1996 Bond Offering, but which is not alleged to have played any other role) does not
contend that the claims against it sound in malpractice, or that it is a professional under
CPLR 214(6).  But DLJ engaged in the alleged negligence (Count 9), negligent
misrepresentation (Count 10), breach of fiduciary duty (Count 12) and aiding and
abetting breaches of fiduciary duty (Count 13) in connection with its performance of its
underwriting contract with Renco Metals, and its various species of alleged misconduct
in each of those respects arose from the same core facts.[112]  Though the negligence and
negligent misrepresentation claims could be regarded analytically as claims for negligent
injury to property (there being no allegations that DLJ engaged in any intentional fraud),
the Court considers New York's 6-year statute of limitations applicable to contract
claims, and to claims for which there is no more specific statute of limitations, applicable
here as well.

That is especially so in light of the New York Court of Appeals' comments in
*Chase Scientific Research,* quoted above, in which that court noted that CPLR 214(6),
providing a shortened 3-year limitations period for the narrow category of professionals
for those covered under CPLR 214(6), should be construed narrowly.

---

[112]    There are no allegations, *e.g.*, that DLJ aided in the issuance of the dividends and other allegedly
wrongful payments by any means other than underwriting the 1996 Bond Offering.

There being no contention that the claims against DLJ are barred under a 6-year statute of limitations, DLJ's motion to dismiss, insofar as based on statutes of limitations, is denied.

<div align="center">

B.

Substantive Motions

</div>

*1.  Claims Against Outsider Defendants*

Relying principally on the Second Circuit's "*Wagoner* Rule," as articulated in *Shearson Lehman Hutton, Inc. v. Wagoner*[113] and its progeny,[114] all of the Outsider Defendants seek dismissal on the grounds that the Trustee lacks standing to bring these causes of action, and is barred by the doctrine of *in pari delicto* from asserting claims premised on assistance to the former Renco Metals and MagCorp management whom the Trustee replaced.  For the reasons that follow, their motions based on standing and *in pari delicto* must be granted.

---

[113]   944 F.2d 114 (2d Cir. 1991) ("*Wagoner*").

[114]   *See, e.g., Wagoner* Rule decisions at the Circuit level:  *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085 (2d Cir. 1995) ("*Hirsch*")*; Mediators, Inc. v. Manney (In re Mediators, Inc.)*, 105 F.3d 822 (2d Cir. 1997) ("*Mediators*")*; Wight v. Bankamerica Corp.,* 219 F.3d 79 (2d Cir. 2000) ("*Wight*"); *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322 F.3d 147 (2d Cir. 2003) ("*Color Tile*"); (*In re Breeden v. Kirkpatrick & Lockhart LLP (In re Bennett Funding Group, Inc.),* 336 F.3d 94 (2d Cir. 2003) ("*Bennett Funding*"); *Bankruptcy Services, Inc. v. Ernst & Young (In re CBI Holding Co.),* 529 F.3d 432 (2d Cir. 2008) ("*CBI*"), *aff'g in part and rev'g in part* 311 B.R. 350 (S.D.N.Y. 2004) (Wood, C.J.) ("*CBI-District*").

Also instructive are certain *Wagoner* Rule cases at the district court level, *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, LLP,* 212 B.R. 34 (S.D.N.Y. 1997) (Knapp, J.) ("*Squadron Ellenoff*"), and portions of *CBI-District,* which were endorsed by the Circuit in *dictum* in its *CBI* decision.  *See CBI,* 529 F.3d at 447 & n.5 ("Judge Wood's analysis of the innocent insider exception and its likely genesis as a product of courts' confusion regarding the relationship between the normal rule of imputation, the adverse interest exception to that rule, and the sole actor exception to that exception is extremely persuasive.")

*a. Standing*

Of course, a party must base his claim on "his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."[115]  While for reasons discussed below, matters of standing cannot here be divorced from application of the equitable doctrine of *in pari delicto*, the Court must first address, as related to the issue of standing, the legal rights and interests are being asserted here.

The extent to which the Trustee has standing to assert the causes of action he is asserting here is determined by an amalgam of federal and state law—requiring, as a matter of federal bankruptcy law, that the causes of action in question be "property of the estate" to which the Trustee takes ownership (a matter that is determined, in the first instance, by section 541 of the Code), and also requiring, as a matter of state law, that the cause of action be one that the debtor (as contrasted to investors, creditors, or other third parties) would own in the first place.

As a matter of federal law, section 541(a) of the Bankruptcy Code provides that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."[116]  "[T]hese legal and equitable interests include causes of action,"[117] and in actions brought by the trustee as successor to the debtor's interest under section 541, the "trustee stands in the shoes of the debtor and can only assert those causes of action possessed by the debtor."[118]  Likewise, the trustee is subject

---

[115]     *Wagoner*, 944 F.2d at 118.

[116]     *Official Comm. of Unsecured Creditors. v. R.F. Lafferty & Co., Inc.,* 267 F.3d 340, 357 (3d Cir. 2001) ("*Lafferty*") (internal quotations omitted).

[117]     *Id.* at 356.

[118]     *Id.*

to defenses that could be asserted against the debtor, unless the underlying state law provides otherwise.

What constitutes "property of the estate" under section 541 of the Code is governed by nonbankruptcy law, most commonly state law.[119]  Here, as a matter of state law, the Court must thus determine whether the Debtors themselves could bring the cause of action in question[120]—since the Trustee, as an estate representative, standing in the Debtors' shoes, has standing to bring only those actions the Debtors could have commenced if not for the bankruptcy filing.[121]  As an analytic matter (though certain of the *Wagoner* progeny trump the conclusion that would result from a purely analytic approach), determination of standing requires inquiry as to whether the injury was to the *corporation* (with resulting claims to be brought by or on behalf of the corporation), or was to *creditors individually* (apart from their indirect stake in distributions from the estate that owes them money).

---

[119]     *See, e.g., In re Ames Dept. Stores, Inc.,* 287 B.R. 112, 122-123 (Bankr. S.D.N.Y. 2002) (Gerber, J.) (explaining  that "[w]hat is property in bankruptcy cases is governed by applicable non-bankruptcy law—usually state law, but sometimes federal law"); *In re Magnesium Corp. of America,* 278 B.R. 698, (Bankr. S.D.N.Y. 2002) (Gerber, J.) (same, speaking to federally created rights).  The observations in these cases have their origin in the landmark case of *Butner v. United States,* 440 U.S. 48, 54-55 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law. … Property interests are created and defined by state law.  Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.")

[120]     *See St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688, 700 (2d Cir. 1989) ("We agree with those courts that have held that the determination of whether a claim may be brought by a creditor of a bankrupt corporation outside of the bankruptcy proceedings depends on an analysis of state law.…  Whether the rights belong to the debtor or the individual creditors is a question of state law."); *The Mediators, Inc. v. Manney (In re Mediators, Inc.),* 105 F.3d 822, 825 (2d Cir. 1997) ("*Mediators*") ("In a bankruptcy proceeding, state law determines whether a right to sue belongs to the debtor or to the individual creditors," citing *St. Paul Fire & Marine*); *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,* 322 F.3d 147, 156 (2d Cir. 2003) (same, quoting *Mediators*).

[121]     *See Color Tile,* 322 F.3d at 156.

In deciding whether the injury was to the corporation or its creditors, the Court believes that "best practices" would call for the court to examine to whom any allegedly breached duty was owed; what was the injury underlying the claims; who suffered the injury; who would gain from the recovery, or lose out if the recovery were awarded to a different successful plaintiff; and, to the extent different from any of the foregoing, whether *any* creditor of the debtor could assert the claim (directly or derivatively on behalf of the corporation), or just those creditors suffering a particularized injury. Engaging in that analysis (and before applying *Wagoner* Rule doctrine that would limit standing further), the Court finds that some of the Trustee's claims pass muster as belonging to the estate, and others do not.

Plainly the Trustee's claims against officers and directors for breaches of fiduciary duty[122] belong to the Debtor estates, and not to individual creditors or other third parties. Under Delaware law—applicable to the claims for breaches of fiduciary duty for the two Delaware corporations, Renco Metals and MagCorp—directors and officers owe their duties to the corporations they serve, even when those corporations become insolvent, or enter the "zone of insolvency."[123]

---

[122]    These claims, most obviously, involve payments of dividends and payments for redemption of stock when the Complaint alleges that Renco Metals was already insolvent, or would be rendered insolvent by these gratuitous transfers.  Under the facts here, they are in essence claims of breach of the duties of care and of loyalty, and the Trustee has standing to assert those claims on behalf of the corporations to whom those duties were owed.

[123]    *See North Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101-103 (Del. 2007) ("*Gheewalla*") ("While there may well be a basis for a direct claim arising out of contract or tort, our holding today precludes a direct claim [by a creditor] arising out of a purported breach of a fiduciary duty owed to that creditor by the directors of an insolvent corporation."); *accord Prod. Res. Group, LLC v. NCT Group, Inc.,* 863 A.2d 772, 790-91 (Del. Ch. 2004) ("*Production Resources*") (quoted and relied on in material part in *Gheewalla*); *Hedback v. Tenney* (*In re Security Asset Capital Corp.*), 390 B.R. 636, 642 (Bankr. D. Minn. 2008) (O'Brien, J.) (applying those principles in a bankruptcy adversary proceeding context, citing, *inter alia*, *Production Resources*).

The factors this Court might consider as part of any standing analysis were
thoroughly addressed in the decisions of the Delaware Supreme Court in *Gheewalla*, and
the Delaware Chancery Court in *Production Resources* in 2007 and 2004, respectively.
As noted in the thoughtful Delaware Chancery Court decision in *Production Resources*,
upon which *Gheewalla* was later largely based:

> [P]oor decisions by directors that lead to a loss of
> corporate assets and are alleged to be a breaches of
> equitable fiduciary duties remain harms to the
> *corporate entity itself*.  Thus, regardless of whether
> they are brought by creditors when a company is
> insolvent, these claims remain derivative, with
> either shareholders or creditors suing to recover for
> a harm done to the corporation as an economic
> entity and any recovery logically flows to the
> corporation and benefits the derivative plaintiffs
> indirectly to the extent of their claim on the firm's
> assets.  The reason for this bears repeating—the fact
> of insolvency *does not change the primary object of
> the director's duties, which is the firm itself*.  The
> firm's insolvency simply makes the creditors the
> principal constituency injured by any fiduciary
> breaches that diminish the firm's value and
> logically gives them standing to pursue these claims
> to rectify that injury.  Put simply, when a director of
> an insolvent corporation, through a breach of
> fiduciary duty, injures the firm itself, *the claim
> against the director is still one belonging to the
> corporation*.[124]

---

[124]   863 A.2d at 792 (emphasis added).  *See also Claybrook v. Morris* (*In re Scott Acquisition Corp.*),
344 B.R. 283 (Bankr. D. Del. 2006) (Walsh, J.) ("*Scotty's*").  As Judge Walsh there observed,
citing, *inter alia*, *Production Resources*:

> The complaint explicitly states that "[a]s a direct and
> proximate result of the breaches of fiduciary duty of the
> Defendants, the enterprise value of Scotty's was substantially
> diminished and the creditors were damaged thereby….
> Certainly, the Trustee has standing to recover for such
> injuries:  If a claim is a general one, with no particularized
> injury arising from it, and if that claim could be brought by
> any creditor of the debtor, the trustee is the proper person to
> assert the claim ....

Likewise, as a purely analytic matter (once more before being trumped by some

of *Wagoner*'s progeny), claims for *aiding and abetting* those breaches of fiduciary duty

belong to the corporations to whom the fiduciary duties were owed, and unless the

applicable state law grants creditors special rights,[125] not to individual creditors. The

underlying injury is the same, as are the relevant duties. As a purely analytic matter,

claims for aiding and abetting breaches of fiduciary duty belong to the estate, just as

claims for the underlying breaches do. The Eighth Circuit has squarely so held.[126]

But even as a purely analytic matter, the Trustee lacks standing to complain with

respect to one of the most important elements of his complaint, inadequate disclosure of

environmental liabilities in connection with the 1996 Bond Offering. A repeating theme

throughout the Complaint is the failure to disclose MagCorp's environmental liabilities in

the 1996 Bond Offering prospectus and related financial statements.[127] Fully assuming,

as the Court does, that the environmental liability disclosures to purchasers of bonds were

---

*Id.* at 291 (internal quotations omitted); *accord Official Comm. of Unsecured Creditors of Norstan Apparel Shops, Inc. v. Lattman* (*In re Norstan Apparel Shops, Inc.*), 367 B.R. 68, 82 (Bankr. E.D.N.Y. 2007) (Craig, C.J.) (citing, *inter alia*, *Scotty's*, rejecting arguments that claims for breach of fiduciary duty belonged to creditors, and holding instead that a breach of fiduciary duty to the corporation was alleged, and that it belonged to the debtor's trustee).

[125] State law presumably could grant creditors or others direct action rights for breach of fiduciary duty, and one of the *Wagoner* progeny, *Hirsch*, *see* n.114 *supra*, notes that Connecticut law provides such rights, at least for limited partners. But the key issue should be whether the corporation itself (from whom the trustee's rights devolve) has the right to sue, not whether other parties (such as creditors or limited partners) also have that right.

[126] *See Moratzka v. Morris* (*In re Senior Cottages of America*), 482 F.3d 997, 1002 (8th Cir. 2007) ("*Senior Cottages*") ("If the corporation owned a cause of action against the principal who breached a duty, it follows that it also owns the cause of action for aiding and abetting the principal's breach.") (under Minnesota law); *Adelphia-Bank of America*, 365 B.R. at 46 & n. 69 (same, quoting *Senior Cottages*) (under Pennsylvania law).

[127] *See, e.g.*, Cmplt. Page 63 Section Heading ("The Prospectus for the 1996 Offering and [Renco] Metals' Financial Statements Failed to Disclose the Extent of the Environmental Liabilities"); Cmplt. ¶ 401 ("DLJ recklessly or negligently failed to disclose in the Registration Statement and the offering documents the risks and potential liabilities associated with MagCorp's environmental matters."). *See also* Cmplt. ¶¶ 145-148, 150-151, 153-160, 195-197, 201-205, 227-229, 250-256, 271, 324-329, 343, 366, 382, 407, 409-412 (all referring to inadequacies in the 1996 Bond Offering registration statement, prospectus, and/or the financial statements).

grossly deficient, and the reserves for environmental liabilities in the financials provided

to the public were grossly inadequate, any resulting claims for such belong to defrauded

investors, and do not belong to the Trustee.  The duties (of full and fair disclosure) that

were breached were owed *to the investors who bought the bonds*, in the underwriting or

thereafter.  And what caused the injury to the investors, following the alleged inadequate

disclosure of environmental liabilities, was the Debtors' inability to satisfy their

contractual duty to pay investors back on the bonds (for the investors who still had them),

or losses investors might have suffered if they sold the bonds prior to bankruptcy.

Thus the Court holds that claims arising from inadequate disclosure in connection

with the 1996 Bond Offering (or, for that matter, thereafter) belong to investors who

bought the bonds.  Such claims are not, and never were, the property of the Debtors, nor

their successor, the Trustee.  The Trustee lacks standing to assert them.[128]

---

[128]    It is possible, though hardly clear, that the Trustee is arguing that he can address his standing
difficulties with respect to the 1996 Bond Offering by arguing that the estate (as contrasted to
investors) itself was injured by reason of an unpleaded invocation of "deepening insolvency."  In
the Trustee's Sur-Reply to Cadwalader Motion to Dismiss, the Trustee has argued that he has
standing to bring suit because deepening insolvency is a cause of action recognized under New
York law.  *See* Sur-Reply at 2.  In subsequent correspondence to the Court, the Trustee retreats
from that assertion, declaring that "only a tortured reading of the Complaint makes deepening
insolvency an element of any of the traditional tort causes of action stated."  *See* Letter dated
10/25/07 (ECF Doc. # 104).

In any event, the Court rejects the contention, if in fact it is still being made, that deepening
insolvency theory results in standing.  Deepening insolvency is not recognized as a separate cause
of action under the law of Delaware, the state under whose law each of Renco Metals and
MagCorp was organized, which governs the duties of officers and directors to the companies they
serve.  *See Trenwick America Litigation Trust v. Ernst & Young, LLP*, 906 A.2d 168, 204-205
(Del. Ch. 2006), *aff'd on opinion below*, 931 A.2d 438 (Del. 2007); *In re Radnor Holdings Corp.*,
353 B.R. 820, 842 (Bankr. D. Del. 2006) (dismissing causes of action for breach of fiduciary duty
and aiding and abetting breach of fiduciary duty because "simply calling a discredited deepening
insolvency cause of action by some other name does not make it a claim that passes muster.").
Thus the directors and officers of Renco Metals and MagCorp could not be charged with primary
violations of duty premised on deepening insolvency theory.  Though they could of course still be
liable on any of the more traditional bases for breach of fiduciary duty, such as violations of their
duties of care, loyalty, and good faith, it would be the dividends and other payments going out of
the estate that would be actionable under those doctrines, not the borrowing effected by the 1996
Bond Offering.

But the Trustee asserts other claims against the Outsider Defendants as well.

Those other claims include claims for aiding and abetting the alleged breaches of

fiduciary duty by Rennert, the Director and Officer Defendants, and the MagCorp Officer

Defendants (which alleged breaches included, most obviously, their authorization and/or

receipt of the dividends and other payments when insolvent)—and, presumably, claims

based on Outsider Defendants' failures to tell Rennert, the Director and Officer

Defendants and the MagCorp Officer Defendants, when they were authorizing and/or

receiving all of those payments, of MagCorp's and/or Renco Metals' environmental

liabilities and resulting insolvency.

Directly bearing on the claims against the Outsider Defendants is the "*Wagoner*

Rule," mentioned above—a rule of state law[129] (in this case, New York law) that has

been developed and applied by the Second Circuit, and by lower courts applying the

Circuit's precedents.  The *Wagoner* Rule has generally been referred to as such to

describe both the principles first articulated in *Wagoner* itself and also the extensions

beyond *Wagoner*'s initial holdings in *Wagoner*'s progeny.

Subject to an exception, discussed below (which in turn has exceptions to the

exception), *Wagoner* and its progeny, applying what is in substance a rule of agency law

---

Apart from that, looking at the matter analytically, it was not refinancing the existing debt, or
executing notes for the incremental funds brought into the Debtors, that hurt the Debtors.  It was
the payouts from the Debtors—particularly the dividends and stock redemptions—that pushed the
Debtors into insolvency, and/or aggravated the insolvency that those Debtors' environmental
liabilities had already created.

[129]   *See, e.g., Hirsch*, 72 F.3d at 1093 ("'Under the Bankruptcy Code, the bankruptcy trustee may
bring claims founded, *inter alia,* on the rights of the debtor and on certain rights of the debtor's
creditors.... Whether the rights belong to the debtor or the individual creditors is a question of state
law.'") (quoting *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.,* 884 F.2d 688, 700 (2d Cir.
1989); *Mediators*, 105 F.3d at 825 ("In a bankruptcy proceeding, state law determines whether a
right to sue belongs to the debtor or to the individual creditors"); *Wight*, 219 F.3d at 86 (same).

(and whose application has aptly been observed to rest on a number of fictions[130]),

impute the wrongful conduct of predecessor management to the corporation itself and

then to the bankruptcy trustee or other estate representative.  Even if (as is normally the

case) the trustee did nothing wrong, and is instead an innocent fiduciary trying to recover

for the injured corporation (and indirectly, by reason of their interests in their own

recoveries from the injured corporation, innocent creditors), former management's

imputed misconduct gives rise to an *in pari delicto* defense.  In addition, under certain of

the *Wagoner* progeny, management misconduct deprives a trustee even of *standing* to

assert claims for injuries to the corporation for whom the trustee acts.

While the defense of *in pari delicto* is also applicable here (and in fact is better

grounded analytically, as discussed below), the Court must first address (and of course

cannot ignore) the *Wagoner* Rule insofar as it affects standing.  Though the *Wagoner*

Rule is wholly uncontroversial when the essence of the claim is an injury to third parties

(such as investor victims of fraud)[131]—for which few would suggest that a trustee should

have the requisite standing[132]—*Wagoner* has been extended beyond that, to apply where

the injury was in whole or in material part an injury to the debtor corporation itself.

---

[130]    *See CBI-District*, 311 B.R. at 369, 370, 373.

[131]    This was the case in some, but not all, of the *Wagoner* Rule cases—*e.g. Wagoner*, 944 F.2d at 116 (selling worthless notes to church members) (New York law); *Hirsch*, 72 F.3d at 1088 (Ponzi scheme) (Connecticut law); *Bennett Funding* 336 F.3d at 96 (Ponzi scheme) (New York law).  In other *Wagoner* Rule cases, it would be difficult to say, except by application of a fiction, that creditors were the victims; rather, the victim was in fact the corporation itself.  *See, e.g.*, *Mediators*, 105 F.3d at 823-824 (bank, law firm and accounting firm were charged with assisting debtor's CEO in selling the debtor's greatly appreciated artwork to himself at a bargain price, stripping the estate of its assets while rendering the estate liable to the bank "for the cost of the self-dealing purchase").

[132]    The injury was to *third parties* in the Appellate Division decision upon which the original *Wagoner* decision (where the injury also was to third parties) was largely based, *Barnes v. Schatzkin*, 215 A.D. 10, 212 N.Y.S. 536 (1st Dep't 1925) ("*Barnes*"), *abrogated by statute insofar as it addressed federal law, CBI-Circuit*, 529 F.2d at 454-459 (explaining the enactment of Bankruptcy Code section 541(a)(7)).

Thus, in the plainest example of those cases, *Mediators*, the Second Circuit
affirmed the dismissal of claims brought by a creditors' committee against a bank and
law firm that were charged with aiding and abetting the breaches of fiduciary duty by
Richard and Gloria Manney—the debtor's CEO and his wife, who was the debtor's
treasurer, secretary and a director.  The claim was not that the Manneys had defrauded
investors (as in *Wagoner*), but rather that, in a self-dealing transaction, they had
appropriated corporate assets for themselves for little or no consideration.[133]  While the
complaint charged a classic self-dealing transaction, which injured the corporation itself,
and neither the complaint nor the surrounding facts suggested any direct injury to
creditors, the claims were held to belong to the creditors.  Citing the predecessor
decisions in *Wagoner* and *Hirsch* (though *Wagoner* involved injuries to investor church
members, and *Hirsch*, decided under Connecticut law, involved a Ponzi scheme
principally injuring non-debtor investors), and *Barnes* (which likewise involved an injury
to non-debtors), the *Mediators* court ruled that "the Mediators has *no standing* to assert
aiding-and-abetting claims against third parties for cooperating in the very misconduct
that it had initiated."[134]

Similarly, though *Hirsch,* decided two years before *Mediators*, principally
involved a Ponzi scheme injuring investors rather than the corporation itself, the
*Wagoner* Rule was applied at the Circuit level to bar the *entirety* of the trustee's
malpractice claims against the debtor corporation's auditor—even when the Circuit
recognized that the debtors may have suffered "independent financial injury" as a result
of the malpractice—as the malpractice was "closely tied" to the fraud perpetrated on

---

[133]      *See* 105 F.3d at 824.

[134]      105 F.3d at 826 (emphasis added).

creditors/investors.[135]  In its most recent *Wagoner* Rule decision, *CBI*, the Circuit fully

recognized, and expressly noted, that *Hirsch* had applied the *Wagoner* Rule to a case

where the corporation too had been injured.[136]

       *Wagoner* and its progeny have been criticized by other Circuit Courts for

conflating potentially applicable *equitable defenses* (most obviously, *in pari delicto*) into

matters of *standing*, when the corporation represented by the trustee or other estate

representative plainly was injured.[137]  And their state law underpinnings, at least in New

York—principally, *Barnes*, a 1925 Appellate Division case[138]—are thin; *Barnes* supports

focusing on whether the injury was to creditors or to the estate, but does not support

---

[135]     *See* 72 F.3d 1085, 1094-1095, n.6.

[136]     *See* 529 F.3d at 448 ("Thus in *Hirsch*, … we held that a trustee lacked standing to sue a bankrupt corporation's auditors 'for professional malpractice on the basis that activities undertaken by the [auditors] to effectuate … scheme[s aimed at defrauding creditors] *also* impacted adversely upon' the corporation") (emphasis in original).

[137]     *See Lafferty,* 267 F.3d at 346 ("An analysis of standing does not include an analysis of equitable defenses, such as *in pari delicto.* Whether a party has standing to bring claims and whether a party's claims are barred by an equitable defense are two separate questions, to be addressed on their own terms."); *Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards,* 437 F.3d 1145, 1149-1150 (11th Cir. 2006) (*PSA*) (same, quoting *Lafferty*); *Senior Cottages*, 482 F.3d at 1002-1004 ("Although *Wagoner* has been followed in the Second Circuit, it has also been criticized for characterizing an *in pari delicto* defense as a standing issue.... Several other circuits have declined to conflate the constitutional standing doctrine with the *in pari delicto* defense…. We agree with the First, Third, Fifth, and Eleventh Circuits that the collusion of corporate insiders with third parties to injure the corporation does not deprive the corporation of standing to sue the third parties, though it may well give rise to a defense that will be fatal to the action.") (citations omitted).  *See also Grumman Olson,* 329 B.R. at 424 n. 5 (noting that while litigants and courts sometimes refer to standing and *in pari delicto* concerns interchangeably, they are not the same).

When this Court considered *Wagoner* Rule arguments in a case governed by Pennsylvania law, *Adelphia-Bank of America*, it expressed doubts as to whether the Second Circuit would continue to view *in pari delicto* as affecting standing after review of the newer cases—and stated that on a Pennsylvania state law determination as to which *Wagoner* and its progeny were not binding, this Court should follow the more recent and refined thinking on the matter of standing, which hold that matters of standing and of equitable defenses to claims asserted by those who have standing are different things.  *See* 365 B.R. at 46 n.66.  Here, however, the Second Circuit's decisions, on a matter of New York law, *are* binding on this Court.

[138]     *See* n.139, *supra.*

going beyond that, so as to declare that claims for injury actually suffered by the estate are *deemed to be* claims by creditors.[139]

For those reasons, if this Court were writing on a clean slate, it would not elevate *in pari delicto* concerns to matters of standing where the alleged injury is an injury to the corporation itself.[140]  But the Court is not writing on a clean slate, and the Court must conclude that so long as *Wagoner* progeny *Mediators* and *CBI* remain good law, lower courts in the Circuit deciding issues of this character under New York law are bound likewise to hold that estate representatives lack standing to assert claims for aiding and abetting (unless an applicable *Wagoner* Rule exception applies), even when it is the estate itself that was injured.[141]

---

[139]  In *Barnes*, a trustee of a partnership alleged to have been engaging in conducting a bucket shop (converting to their own use "cash and collateral of their customers," causing those customers to lose "the equities in their several accounts," *id.* at 10-11) took assignments of the claims of customers injured thereby and tried to sue them.  *Id.*  (The injuries, of course, were to each of the individual customers whose cash and collateral were converted.)  Construing the now-superseded Bankruptcy Act (of 1898), the Appellate Division held that the claims on which the plaintiff trustee had sued "were never part of the assets of the [estate], nor did they arise in favor of the plaintiff as trustee in bankruptcy.  They belonged to various creditors." *Id.* at 11.

[140]  Here there was injury to the corporation itself with respect to the dividends and stock redemptions, but not with respect  to selling bonds to the public in the absence of appropriate disclosure of the environmental liabilities.

[141]  It should be noted, however, that the *Wagoner* rule does not limit a trustee's standing to bring causes of action—for breach of fiduciary duty, for example—against a corporation's own officers and directors.  *See, e.g.*, *Global Crossing Estate Representative v. Winnick*, 2006 WL 2212776, at *15 (S.D.N.Y. Aug. 3, 2006) (Lynch, J.) ("Courts have held that the *Wagoner* and 'in pari delicto' rules do not apply to claims against corporate insiders for breach of their fiduciary duties."); *In re IDI Const. Co. Inc.*, 345 B.R. 60, 67 (Bankr. S.D.N.Y. 2006) (Bernstein, C.J.) ("The *Wagoner* Rule does not bar claims by a corporation against its own fiduciaries.  Accordingly, it would not bar the IDI Estate from suing [the debtor's principals] to recover the unpaid loans or to recover damages under any other theory.") (citations omitted); *In re Grumman Olson Indus., Inc.*, 329 B.R. 411, 425 (Bankr. S.D.N.Y. 2005) (Bernstein, C.J.) ("[T]he *Wagoner* rule does not bar claims against corporate fiduciaries….").

-54-

### b. In Pari Delicto

As noted above, the Trustee is also subject to defenses that could be asserted against the debtor, unless the underlying state law provides otherwise.  One such defense in New York (and other, though not all, jurisdictions) is the doctrine of *in pari delicto*.

In several jurisdictions, under the state law there applicable, courts have held that innocent creditors, represented by a trustee, receiver, or other litigation representative, should not be penalized for the wrongful conduct of predecessor corporate management[142]—even if the corporation itself, while under the ownership or control of

---

[142]     For instance, in *Universal Builders, Inc. v. Moon Motor Lodge, Inc.*, 430 Pa. 550, 244 A.2d 10, 13-14 (1968) ("*Universal Builders*"), the Pennsylvania Supreme Court considered the extent to which a debtor's unclean hands should be applied to penalize the innocent creditors of a debtor in bankruptcy, and was unwilling to countenance such a result.  This Court discussed *Universal Builders* at length in its decision in *Adelphia-Bank of America*, and need not discuss *Universal Builders* at comparable length here.  But this Court notes two of the reasons that led the Pennsylvania Supreme Court to that result.

First, the *Universal Builders* court found a basis for distinction between charging a litigant with responsibility for his *own* unclean hands and charging a *principal* with the unclean hands of its agent based solely on agency theory.  It held that "[t]he attribution of one party's unclean hands to another party is not based on simple agency principles."  It noted the potential unfairness of such a result, quoting language by Learned Hand speaking to that unfairness, which had started as a dissenting opinion but which ultimately became a unanimous opinion of the Second Circuit.  *See Art Metal Works v. Abraham & Straus*, 70 F.2d 641, 646 (2d Cir. 1934) (L. Hand, dissenting), *cert. denied*, 293 U.S. 596, 55 S.Ct. 110, 79 L.Ed. 689 (1934), *dissent adopted as opinion of the court on rehearing*, 107 F.2d 944 (2d Cir. 1939) (*per curiam*), *cert. denied*, 308 U.S. 621 (1939) ("*Art Metal Works*") ("Whenever the question has come up, it has been held that immoral conduct to be relevant, must touch and taint the plaintiff *personally*.") (emphasis added).  In *Universal Builders*, the Pennsylvania Supreme Court concluded that "[i]n this case, appellant offers no persuasive reasons for imputing [the insider's] conduct to the bankrupt corporation, nor do we see any such reasons ourselves."  244 A.2d at 13-14.

Second, the *Universal Builders* court held that assuming, for the sake of argument, that the insider's conduct should be imputed to his bankrupt company, the application of the unclean hands doctrine to deny relief was "within the discretion of the chancellor."  *Id.* at 14.  It continued:

> Where the rights of innocent parties are involved, the doctrine should be applied cautiously, and the doctrine should not be invoked if its application will produce an inequitable result.  To deny plaintiff recovery in this case would result in the enrichment of [the defendant] at the expense of innocent creditors of the bankrupt [debtor].  This is an inequitable result and thus we are not persuaded that the clean hands doctrine should be applied.

insider wrongdoers very understandably would be.  But neither the Second Circuit, nor

any New York state court, so far as this Court is aware, has yet so held.  At this time,

*Wagoner* progeny at the Circuit level require that in a case like this one, governed by

New York law, the trustee be barred by *in pari delicto* from recovery for damage to the

estate occasioned by alleged assistance of former management's wrongful conduct,

unless facts supporting an applicable *Wagoner* Rule exception are found.

As noted above, the Pennsylvania Supreme Court, in *Universal Builders*, has

ruled that *in pari delicto* is properly regarded as an equitable defense, which not only

---

*Id.*  The Pennsylvania Supreme Court was not unique in coming to that view.  In *Scholes v. Lehmann,* 56 F.3d 750, 753-755 (7th Cir. 1995), the Seventh Circuit considered an *in pari delicto* defense to a suit by a receiver against third parties in a fraudulent conveyance action.  Speaking through Judge Posner, the Seventh Circuit observed:

> The appointment of the receiver removed the wrongdoer from the scene.  The corporations were no more [the wrongdoing insider] Douglas's evil zombies.  Freed from his spell they became entitled to the return of the moneys—for the benefit not of Douglas but of innocent investors.... The important thing is that the limited partners were not complicit in Douglas's fraud; they were its victims.  Put differently, the defense of *in pari delicto* loses its sting when the person who is *in pari delicto* is eliminated.

*Id.* at 755 (citations omitted). *See also FDIC v. O'Melveny & Myers,* 61 F.3d 17 (9th Cir. 1995) (*per curiam*).  Applying California law to the claims of the FDIC, as the receiver to a failed savings and loan, against a law firm for malpractice and breach of fiduciary duty, the Ninth Circuit observed:

> We recognize that, in general, "[a] receiver occupies no better position than that which was occupied by the person or party for whom he acts ... and any defense good against the original party is good against the receiver." ... However, this rule is subject to exceptions; defenses based on a party's unclean hands or inequitable conduct do not generally apply against that party's receiver.... While a party may itself be denied a right or defense on account of its misdeeds, there is little reason to impose the same punishment on a trustee, receiver or similar innocent entity that steps into the party's shoes pursuant to court order or operation of law.  Moreover, when a party is denied a defense under such circumstances, the opposing party enjoys a windfall.  This is justifiable as against the wrongdoer himself, not against the wrongdoer's innocent creditors.

*Id.* at 19 (citations omitted).

does not involve ownership of the cause of action, but which should selectively be

employed depending upon the equities of the case.  The Seventh and Ninth Circuits have

held similarly.  And if the Court were writing on a clean slate, it would be slow to

penalize an estate representative for the misconduct of the management the representative

displaced, and would decide whether or not to apply *in pari delicto* only after an analysis

akin to that prescribed by the Pennsylvania Supreme Court in *Universal Builders*.  But

once again, the Court is not writing on a clean slate, as *Wagoner* progeny construing New

York State law at the Circuit level—*Mediators* and *CBI*[143]—are  binding on this Court.

The Court would welcome guidance by the Circuit as to whether it continues to

believe, in light of the matters discussed above, that *Wagoner* and its progeny should

continue to deny standing or apply *in pari delicto* when an innocent trustee has displaced

wrongdoing management.  And the Court would particularly welcome the views of the

New York Court of Appeals on these matters—especially as to whether the New York

Court of Appeals sees things as the Pennsylvania Supreme Court does.  But until either

the Second Circuit or the New York Court of Appeals speaks further to these matters, the

Court must follow the *Wagoner* Rule in its present form.

Thus here the Trustee will be barred by *in pari delicto* from recovery from the

Outsider Defendants on his New York state law claims, unless facts supporting an

applicable *Wagoner* Rule exception are found.

### c.  Wagoner Rule Exception

As noted, the *Wagoner* Rule has an exception, whose application, in turn, is

subject to exceptions of its own.  As explained by the Second Circuit in *CBI*, the rationale

---

[143]     *Hirsch* came up from the District of Connecticut.  The Circuit has noted that *Hirsch* was decided
under Connecticut law.  *See CBI*, 529 F.3d at 448.

underlying the *Wagoner* rule derives from "the fundamental principle of agency" that the misconduct of managers within the scope of their employment will normally be imputed to the corporation."[144]  That principle of imputation is itself based "on the presumption that an agent will normally discharge his duty to disclose to his principal all the material facts coming to his knowledge with reference to the subject of his agency, and thus any misconduct engaged in by a manager is with—at least—his corporation's tacit consent.[145] But under New York law, the "Adverse Interest Exception" rebuts this usual presumption.[146]  Under this exception, management misconduct will not be imputed to the corporation if the officer acted "entirely in his own interests and adversely to the interests of the corporation."[147]  The theory is that "when an agent is engaged in a scheme to defraud his principal, either for his own benefit or that of a third person, ... he cannot be presumed to have disclosed that which would expose and defeat his fraudulent purpose."[148]  The Circuit has noted, however, that this exception is a narrow one and that the guilty manager "must have totally abandoned" his corporation's interests for it to apply.[149]

It is debatable whether the allegations of the Complaint, if proven, would support a finding that Rennert, the Director and Officer Defendants and/or MagCorp Officer Defendants *defrauded* their principals—either Renco Metals or MagCorp—as all of their conduct appears to have been entirely in the open.  But the allegations of the Complaint

---

[144]     529 F.3d at 448.

[145]     *Id.* (citations omitted).

[146]     *Id.*, citing *Mediators,* 105 F.3d at 827.

[147]     *Id.*

[148]     *Id.*

[149]     *Id.*

leave room for a showing that in authorizing and receiving the dividends and other

payments they did (and especially receiving such dividends and other payments),

Rennert, the Director and Officer Defendants and/or MagCorp Officer Defendants

"totally abandoned" their corporation's interests.  Such a showing, if not accompanied by

more, could provide a basis for application of the Adverse Interest Exception.  But here

there *is* more, as there are exceptions to the exception—each of which has the effect of

requiring imputation of the wrongful conduct to the Trustee, and thus once more

requiring dismissal of the claims against the Outsider Defendants for lack of standing

and/or *in pari delicto*.  The first exception is the so-called "Sole Actor Exception," where

the agent allegedly acting wrongfully is the debtor's sole shareholder, and is in substance

the corporation itself.  It may or may not be applicable here, depending on the extent to

which Rennert, Renco Group's beneficial owner, needed cooperation or assistance from

other Renco Metals directors and/or managers to cause the dividends and other payments

to be made.  The second exception, upon which the parties place greater focus, is where a

corporation has multiple managers or decision-makers, and *all* such relevant decision-

makers participate in the alleged wrongdoing.[150]

The Outsider Defendants contend that the latter "exception to the exception"

applies, and thus that the *Wagoner* Rule continues to apply.  The Court agrees.  Here

*every* member of the Debtors' boards of directors was named a defendant by the Trustee,

and charged with wrongful conduct.  And while the Trustee alleges, "upon information

---

[150]     *See CBI-District*, 311 B.R. at 373.  The second exception is sometimes referred to as the "Innocent
Insider Exception."  But strictly speaking, it applies when there is *no* innocent insider.  When there
is no innocent insider, it operates as an exception to the Adverse Interest Exception, with the result
that even though a wrongdoer might act wholly adversely to the corporation (and thus the adverse
interest exception to the *Wagoner* Rule would apply, precluding the imputation that normally
would exist under the *Wagoner* Rule), the absence of an innocent insider would result in
imputation after all.

and belief," that "at least one decision maker in a management role at MagCorp was innocent of the fraud described herein and could have, and would have, acted to prevent such fraud,"[151] no officer or director at MagCorp (or especially, Renco Metals, which is alleged to have engaged in most of the wrongful conduct, including, especially, the dividends and payments) was identified.  In *Squadron Ellenoff*[152]—an action charging a law firm with malpractice, breach of contract and breach of fiduciary duty arising out of the law firm's failure to stop fraud directed by the CEO of Towers Financial—Judge Knapp recognized that the presence of an innocent decision maker would vitiate the law firm's ability to invoke the *Wagoner* Rule to escape liability for alleged wrongful conduct.[153]  But he found the complaint deficient in "*actually alleg[ing]* the existence of an innocent member of Towers' management who would have been able to prevent the fraud had he known about it."[154]  He continued that "absent such an allegation in the Complaint[,] the trustee would not have standing to assert the instant claims under the *Wagoner* rule," and thus granted the defendant's motion to dismiss.[155]

The action brought by the Trustee here stands in contrast to *Adelphia-Bank of America*, where this Court ruled that allegations in the *Adelphia-Bank of America* complaint that independent directors took curative action, by supplemental disclosure and ousting the Rigases, once they discovered the Rigases' fraud, could satisfy the requirements for the innocent decision maker exception.[156]  Here the Trustee's allegations

---

[151]    Cmplt. ¶ 333.

[152]    *See* n.114, *supra*.

[153]    *See* 212 B.R. at 36.

[154]    *Id.* (emphasis added).

[155]    *Id.*

[156]    *See* 365 B.R. at 57 & n.135.

in the Complaint with a view to satisfying the innocent decision maker exception are conclusory and unsupported by any facts—and, significantly, are lacking in identification of the innocent decision maker who would have prevented the dividends and other payments.[157]   They are contradicted by the Trustee's allegations that the directors who authorized the dividends and other payments were *all* wrongdoers.  Where "[g]eneral conclusory allegations" are "belied by more specific allegations of the complaint," they cannot be credited by the Court.[158]

In his briefs and oral argument (though not, so far as the Court can tell, in the Trustee's 155 page complaint), the Trustee has contended that defendant Keith Sabel (who was President and CEO, and a director, of Sabel Industries, and who became CEO, and a director, of Sabel Holdings) qualifies as the innocent decision maker.  The Court cannot agree.

There has been no allegation (or contention) that Sabel was a director (or even officer) of either Renco Metals (which funded the dividends, redeemed the preferred stock, and made some of the other questioned payments), or MagCorp (which made the other questioned payments).  So far as the allegations of the Complaint reflect, he was not within the corporations that are alleged to have dissipated their assets.  And no other facts were argued as to Sabel's role in approving, or arguing against, those payments in any other capacity.  While it has been satisfactorily alleged and/or argued that Sabel

---

[157]    *See id.*

[158]    *Hirsch*, 72 F.3d at 1092.  While the Trustee argues that he is allowed to plead in the alternative, and as a general rule the Court would not quarrel with this notion, here we do not have pleading in the alternative, but pleading as to facts that were flatly alleged in each case without reference to pleading in the alternative, and where assertions, presumably subject to Rule 11, were stated to be true.  In any event, even if the Trustee were not bound by his allegations that every director authorized the wrongful conduct and was liable, the Trustee has not made the allegations required under authority like *Squadron Ellenoff* as to who was innocent, and how the wrongful conduct could have been stopped.

Industries' willingness to be a guarantor of the 1996 Bond Offering facilitated the bond

offering itself, the 1996 Bond Offering (and any disclosure deficiencies with respect to it)

cannot, consistent with the *Wagoner* Rule's most basic and uncontroversial standing

elements, be the focus of the Trustee's claims.  Instead the focus must be on the

dissipation of assets following the 1996 Bond Offering, as to which there has been no

showing, or even argument, that Sabel could, or did, do anything to try to stop that.  As

the Second Circuit remarked in *Bennett Funding*, the *Wagoner* doctrine cannot be

defeated by a "would-a, could-a, should-a test…."[159]

Thus the Court rules that Sabel does not qualify as an independent decision maker

that would provide a satisfactory basis for avoiding the application of the *Wagoner* Rule.

Under existing *Wagoner* Rule doctrine, which the Court is bound to follow, the Trustee

lacks standing under the *Wagoner* Rule, and is also barred by principles of *in pari delicto*

from asserting claims against the Outsider Defendants.[160]  Their motions to dismiss on

these grounds are granted.[161]

---

[159]    336 F.3d at 101.

[160]    For these reasons, the Court does not need to decide, and does not decide, the merits of additional arguments by DLJ and Houlihan that the Trustee has failed to state a claim for breach of their respective contracts.  In each case, the Trustee does not allege breach of an express contractual provision, but rather charges violations of the implied covenant of good faith and fair dealing.  These claims have at their heart alleged failures to discover and/or reveal the environmental liabilities in connection with bond offering (as to which the Trustee lacks standing), and to stop insiders from proceeding with the dividends and other payments (as to which *in pari delicto* applies).  Thus they present classic bases for the application of the *Wagoner* Rule progeny, for so long as the *Wagoner* Rule progeny remain good law.

[161]    DLJ also argues that because a subsidiary (Renco Metals) passed assets up, even as dividends, to its parent (Renco Group), there was no legally cognizable injury to the subsidiary Renco Metals that the Trustee can assert.  Though this requires no extensive discussion (as the Court must dismiss claims against DLJ under the *Wagoner* Rule), the Court pauses to note that it rejects DLJ's contention.  Whatever the analytic justification for DLJ's argument might be where the subsidiary is solvent, such an argument has no merit where the subsidiary is insolvent, and its creditors have the first claim on the subsidiary's assets.

-62-

> ### d. Aiding and Abetting Fraudulent Conveyances
> (Counts 4 (KPMG), 11 (DLJ), 18 (Houlihan
> Lokey), 24 (Cadwalader))

The Trustee also asserts claims against the Outsider Defendants for aiding and abetting the alleged fraudulent conveyances, "under federal and/or state law," "including the Uniform Fraudulent Conveyance Act, adopted in New York as Debtor & Creditor Law § 273."[162]   The Outsider Defendants move to dismiss those claims as well.  Those motions are granted.

In *FDIC v. Porco*,[163] the New York Court of Appeals addressed similar, though not wholly identical, issues.  There the FDIC, acting as the receiver of an insolvent bank, had obtained a large money judgment against a director of the bank's parent corporation in a separate, earlier, action in federal court.  Several years thereafter, the FDIC brought an action in the New York state courts charging two officials of the bank with having assisted the director in transferring moneys in which the director had an interest to an account in Switzerland—though (significantly there, but not necessarily here), the alleged fraudulent conveyance and improper assistance took place during the *pendency* of the FDIC's earlier suit and not after the judgment in that earlier suit had been entered.  More importantly, in *Porco* (as here, with respect to the claims against most of the defendants in this adversary proceeding), there was no claim that the *Porco* defendants were the recipients of the funds that had gone off to the Swiss bank account, or that the defendants benefited in any way from the transfer.  The claim was only that they had *helped* the

---

[162]   Cmplt. ¶ 371 (as asserted against KPMG); *accord* Cmplt. ¶¶ 416 (DLJ), 460 (Houlihan Lokey), 497 (Cadwalader); 535 (Rennert), 587 (Director and Officer Defendants).  *See also* Cmplt. ¶ 664 (making analogous claims under "federal and/or state law," "including the Alabama Fraudulent Transfer Act," against Sabel and Sabel Holdings).

[163]   75 N.Y.2d 840 (1990).

director make the transfer—*i.e.*, that they had aided and abetted the director's fraudulent conveyance, or had conspired with the director to accomplish that end.

These allegations were insufficient, the Court of Appeals in *Porco* ruled, and thus the Court of Appeals affirmed the Appellate Division's dismissal of the claims against the defendants in that case.

In doing so, the Court of Appeals rejected a contention that DCL § 273-a "created a creditor's cause of action in conspiracy, assertable against nontransferees or nonbeneficiaries solely for assisting in the conveyance of a debtor's assets."[164]  The Court of Appeals did not quarrel with the FDIC's contention that DCL § 273-a, when read together with DCL § 279, would provide prejudgment creditors with an interest in the assets sufficient to obtain an order to prevent the debtor, or the debtor's transferees, from disposing of the assets.  But it went on to say that:

> Even if that be so, the statute still cannot fairly be read as creating a remedy against nontransferees who, like defendants here, are not alleged to have dominion or control over those assets or to have benefited in any way from the conveyance.  It is not for us to write such a remedy into the statute by judicial construction.[165]

Analysis of *Porco* is complicated by the fact that Porco involved an issue not present here.  There the FDIC's federal action had not yet resulted in a judgment (or other enforceable debt) when the bank director had made the fraudulent conveyance and the Porco defendants had allegedly assisted him.  And consideration of that fact was a major element of the Court of Appeals' decision in *Porco*, and the sole consideration in the brief memorandum decision of the Appellate Division, First Department that the Court of

---

[164]   *Id.* at 842.

[165]   *Id.*

-64-

Appeals affirmed,[166] which might fairly be regarded as having decided the case on a

different ground.  That is not a consideration here, because of the rights of a trustee in a

bankruptcy case.[167]  But what *is* significant in the Court of Appeals' decision in *Porco*,

by contrast, is that court's unwillingness to extend New York's fraudulent conveyance

law to those who "are not alleged to have dominion or control over those assets or to

have benefited in any way from the conveyance," and its belief that imposing secondary

---

[166]    *See FDIC v. Porco*, 147 A.D.2d 422, 423, 538 N.Y.S.2d 261, 261 (1st Dep't 1989), *aff'd*,
75 N.Y.2d 840 (1990) (the dismissal motion should have been granted because "it appears well
settled in New York that a creditor must have a lien or other interest in fraudulently transferred
property of his debtor in order to maintain an action for damages for conspiracy to defraud him of
his claim by such transfer.").

[167]    *See* Bankruptcy Code section 544.  It provides, in relevant part:

> § 544. Trustee as lien creditor and as successor to certain
> creditors and purchasers
>
> (a) The trustee shall have, as of the commencement of the
> case, and without regard to any knowledge of the trustee or of
> any creditor, the rights and powers of, or may avoid any
> transfer of property of the debtor or any obligation incurred by
> the debtor that is voidable by—
>
>> (1) a creditor that extends credit to the debtor at the
>> time of the commencement of the case, and that
>> obtains, at such time and with respect to such credit,
>> a judicial lien on all property on which a creditor on a
>> simple contract could have obtained such a judicial
>> lien, whether or not such a creditor exists;
>>
>> (2) a creditor that extends credit to the debtor at the
>> time of the commencement of the case, and obtains,
>> at such time and with respect to such credit, an
>> execution against the debtor that is returned
>> unsatisfied at such time, whether or not such a
>> creditor exists; or
>>
>> (3) a bona fide purchaser of real property, other than
>> fixtures, from the debtor, against whom applicable
>> law permits such transfer to be perfected, that obtains
>> the status of a bona fide purchaser and has perfected
>> such transfer at the time of the commencement of the
>> case, whether or not such a purchaser exists.
>
> (b)(1) [With an exception not relevant here], the trustee may
> avoid any transfer of an interest of the debtor in property or
> any obligation incurred by the debtor that is voidable under
> applicable law by a creditor holding an unsecured claim that is
> allowable under section 502 of this title or that is not
> allowable only under section 502(e) of this title.

-65-

liability against those who were not transferees would be "writ[ing] such a remedy into the statute by judicial construction."[168]

Many courts, state and federal, citing *Porco*, have rejected efforts to impose fraudulent conveyance secondary liability on those not receiving transferred property.[169] *Porco*, and the other courts applying it, overwhelmingly support dismissal of the like claims here.[170]

For similar reasons, the Court holds that there is no federal right of action for aiding and abetting fraudulent conveyances under Bankruptcy Code section 548, and that

---

168 Some aiders and abettors might be regarded as having "benefited in any way" from whatever motivated them to assist the transferor in effecting a fraudulent conveyance, but this Court does not read *Porco* as speaking so broadly as to cover them. That would create an exception that swallows up the general rule. Rather, this Court reads *Porco* as limiting recovery to those who, in whole or in part, *receive* the transferred property, or have *dominion or control* over it.

169 *See, e.g.*, *Gallant v. Kanterman,* 198 A.D.2d 76, 603 N.Y.2d 315 (1st Dep't 1993) (affirming dismissal of claims against attorney defendants who allegedly assisted other defendants in effecting fraudulent conveyance of corporate stock; "This transaction did not make the attorney defendants … either transferees or beneficiaries of a conveyance of stock which can be set aside, and there is no remedy under this statute for money damages against these parties."); *Geren v. Quantum Chem. Corp.*, 832 F. Supp. 728, 737 (S.D.N.Y. 1993), *aff'd* 99 F.3d 401 (2d Cir. 1995) (Leval, J., then a district judge) ("The New York Court of Appeals recently explicitly rejected the contention that New York law 'created a creditor's cause of action in conspiracy, assertable against nontransferees or nonbeneficiaries solely for assisting in the conveyance of a debtor's assets.'"); *Foufas v. Leventhal*, 1995 WL 332020, at *2 (S.D.N.Y. June 5, 1995) (Buchwald, J.); ("Defendant Graubard contends that New York courts recognize no cause of action against a person in his position who was neither a transferee nor a beneficiary of an allegedly fraudulent transfer. We agree."); *Roselink Investors, LLC v. Shenkman,* 386 F.Supp.2d 209, 226-227 (S.D.N.Y. 2004) (Mukasey, C.J.) ("New York law does not recognize 'a creditor's remedy for money damages against parties who, like defendants here, were neither transferees of the assets nor beneficiaries of the conveyance.' … This is because '[t]he creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance. Therefore, there can be no action for damages against a party who did not receive any of the property sought by the creditors.'") (citations omitted).

170 The Trustee argues, however, that *Joel v. Webber*, 197 A.D.2d 396, 602 N.Y.S.2d 383 (1st Dep't 1993), a decision issued after *Porco*, calls for a different result. The Court disagrees. It is axiomatic that to the extent *Porco* and *Joel* considered the same question of law, the Court of Appeals level decision in *Porco* is controlling. And this Court must note that *Joel*, a brief 1-page decision, failed to mention *Porco*. Finally, *Joel* may be understood in light of the fact that the defendant law firm was alleged to have been the actual recipient of the $75,000 legal fee that was alleged to have been a fraudulent conveyance. *See id.* at 397, 602 N.Y.S.2d at 384.

the federal statutory provision reaches only actual recipients of the property in
question.[171]

### e. Civil Conspiracy (Counts 7 (KPMG),14 (DLJ), 21 (Houlihan), and 27 (Cadwalader))

In Counts 7, 14, 21, and 27, the Trustee charges Outsider Defendants KPMG,
DLJ, Houlihan and Cadwalader with civil conspiracy.  They move to dismiss the
conspiracy claims on the additional ground that New York does not recognize an
independent tort for civil conspiracy, or alternatively that the claims for civil conspiracy
are duplicative of the other causes of action.  Though the Court believes, for reasons
stated above, that the conspiracy claims against the Outsider Defendants must be
dismissed under the *Wagoner* Rule, for lack of standing and by reason of *in pari delicto*,
the Court briefly notes, for the sake of completeness, that the analysis further on in this
Decision—as to the conspiracy claims insofar as they are asserted against Rennert, the
Director and Officer Defendants, and the MagCorp Officer Defendants—applies here as
well.  Thus the Outsider Defendants' motions to dismiss Counts 7, 14, 21, and 27 are
granted on this additional ground.

### 2. Claims Against Officers, Directors, and Renco Group

#### a. Breach of Fiduciary Duty

In Count 31, the Trustee asserts claims for breach of fiduciary duty against
Rennert and in Count 39, the Trustee asserts breach of fiduciary against the Director and
Officer Defendants.  In Counts 32, 40 and 45, the Trustee asserts claims against those

---

[171]   *See, e.g., Klein v. Tabatchnick*, 610 F.2d 1043, 1048 n.4 (2d Cir. 1979) (construing predecessor
language under former Bankruptcy Act, stating that district court acted properly in dismissing
claim against individual who did not hold or received allegedly fraudulently transferred property);
*Robinson v. Watts Detective Agency, Inc.*, 685 F.2d 729, 738 (1st Cir. 1982) (same); *Jackson v.
Star Sprinkler Corp. of Fla.*, 575 F.2d 1223, 1234 (8th Cir. 1978) (same).

defendants, and also Renco Group, for aiding and abetting the alleged breaches of fiduciary duty on the part of Rennert and the Director and Officer Defendants.

Rennert, the Director and Officer Defendants, and Renco Group move to dismiss all of those claims for failure to state claims upon which relief can be granted, arguing that while Rennert and the Director and Officer Defendants were indeed officers and/or directors of Renco Metals and MagCorp,[172] they did not owe any fiduciary duties to those entities, but owed their fiduciary duties to the ultimate corporate parent, Renco Group. They premise their dismissal motion on an argument that they also were officers and directors of Renco Group; that Renco Metals was a wholly owned subsidiary of Renco Group; and that individuals who were officers or directors of both parent and wholly-owned subsidiary could properly manage the affairs of the subsidiary in the interests of the parent and its shareholders—and impliedly, without regard to the needs and concerns of the subsidiaries' creditors.

Some or all of them also argue that even if it were so that Renco Metals and MagCorp were insolvent, the Trustee still could not hold them responsible for breaches of fiduciary duty, because any such claims would belong to creditors, and not the companies as to whom they were officers and directors.

Finally, the Director and Officer Defendants, and the MagCorp Officer Defendants argue that there can be no claims for breach of fiduciary on their part because there are no allegations of injury to Renco Metals or MagCorp, especially because

---

[172]    Of course, Renco Group itself was not an officer or director of Renco Metals or MagCorp. But Renco Group might be liable, under agency or other doctrines, for Rennert's acts. Unfortunately, the extent to which Renco Group would be liable based on Rennert's acts does not appear to have been briefed to the same extent as other issues. The Court considers it inappropriate to dismiss these claims against Renco Group at this time, without prejudice to consideration, if desired, at the summary judgment stage.

Rennert owned 95.8% of Renco, Renco Metals' sole shareholder, and that the Director

and Officer Defendants' and MagCorp Officer Defendants' votes or actions were not

necessary to cause any action by Renco Metals or MagCorp.

The Court rejects all three arguments. The motions of Rennert, the Director and

Officer Defendants and Renco Group to dismiss the claims against it on these bases are

denied.

The contentions by Rennert and the Director and Officer Defendants motions that

they owed no fiduciary duties under the facts here to the corporations of which they were

officers and directors—and impliedly, that they could authorize millions of dollars of

dividends and other gratuitous transfers when their companies were insolvent, because it

was in the interests of their company's shareholder that they do so—are wholly without

merit. Those contentions fail to take into account the allegations of insolvency in the

complaint here, and the legal principle that while officers and directors of subsidiaries

may legitimately advance the interests of the corporate parent when the subsidiaries are

not insolvent, they may no longer do so when the subsidiaries are insolvent, or would be

rendered insolvent by the contemplated action.

Rather, they must then look to the needs and concerns of the subsidiaries for

whom they are officers or directors, and must take into account, in any corporate

decision-making, the fact that creditors will have a superior claim to corporate assets.[173]

As noted in the *Scotty's* case,[174] wherein the same argument was rejected:

---

[173]     *See Production Resources*, *supra*, 863 A.2d at 792 ("The firm's insolvency … makes the creditors
         the principal constituency injured by any fiduciary breaches that diminish the firm's value and
         logically gives them standing to pursue these claims to rectify that injury.").

[174]     *See* n.124, *supra*.

> It would be absurd to hold that the doctrine that
> directors owe special duties after insolvency is
> inapplicable when the insolvent company is a
> subsidiary of another corporation.  That is precisely
> when a director must be most acutely sensitive to
> the needs of a corporation's separate community of
> interests, including both the parent shareholder and
> the corporation's creditors.  The Delaware courts
> have recognized that directors who hold dual
> directorships in the parent-subsidiary context may
> owe fiduciary duties to each corporation.…  There
> is no basis for the principle propounded by a few of
> the Defendants that the directors of an insolvent
> subsidiary can, with impunity, permit it to be
> plundered for the benefit of its parent
> corporation.[175]

Judge Walsh's analysis in *Scotty's* is compelling in this regard.

Likewise, the Court rejects the contention that claims of breach of fiduciary duty

belong to creditors, and not to the representative of the corporation whom those officers

and directors served.  *Gheewalla* and *Production Resources* put that contention to rest.

Though those movants' argument was made before *Gheewalla* and *Production Resources*

came down, the conclusion those two cases reached was predictable.[176]

And the fact that directors or officers of a *solvent* corporate subsidiary permissibly

can be influenced by the corporate parent(s) of that subsidiary has no relevance when the

---

[175]    *Id.* at 289 (citations omitted).  *See also Collins v. Kohlberg & Co.* (*In re Southwest Supermarkets, LLC*), 376 B.R. 281, 282-283 (Bankr. D. Ariz. 2007) (Haines, J.) (citing, *inter alia, Scotty's*, "Delaware law does impose fiduciary duties on the officers and directors of a wholly owned subsidiary that run directly to the subsidiary itself, and not only to its sole shareholder.… It would be a startling and dramatic departure from settled law to conclude that officers and directors do not owe any fiduciary duty to the corporation they serve.").

Thus the Court considers *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171 (Del. 1988), to be distinguishable and wholly inapplicable.  The context in which *Anadarko* stated that "the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent," *id.* at 1174, was one where there were no claims of insolvency, and indeed, the words "insolvent" and "insolvency" appear nowhere in the *Anadarko* opinion.

[176]    *See, e.g.*, James Gadsden, *Enforcement of Directors' Fiduciary Duties in the Vicinity of Insolvency,* 14 Am. Bankr. Inst. J. 16, 16, 47 (2005) (in an analysis before *Production Resources* came out, anticipating the clarification *Production Resources* put forth).

subsidiary is insolvent or in the zone of insolvency.  Here the complaint has much more than sufficient allegations of the insolvency that triggers an exception to the general rule.

   b. *Aiding and Abetting Breaches of Fiduciary Duty—Insiders*

The Trustee also brings claims for aiding and abetting breaches of fiduciary duty in Counts 32 (Rennert), 40 (Director and Officer Defendants), and 45 (Renco Group).  Once more, those defendants move to dismiss.  Although the Court of course will be wary before it permits an aiding-and-abetting double-recovery against any defendants who are also officers or directors who might be found liable for breach of fiduciary duty (a matter that can be addressed hereafter), these defendants' motions to dismiss—most meaningful in the case of Renco Group—are denied.

Obviously, none of Rennert, the Director and Officer Defendants, or Renco Group is an outsider that assisted the Debtors' management.  The first two are the management itself and the third is an entity for whom Rennert was an agent—if not also *the* agent— and whose wrongful acts, if any, should appropriately be imputed to Renco Group just as much, if not more, as they might be to the Trustee.  It would turn the *Wagoner* Rule, and principles of *in pari delicto*, on their respective heads to give management absolution from responsibility they might otherwise have because their own wrongful conduct was imputed to the corporation to whom they allegedly were negligent or faithless.

To the extent that those charged with secondary liability for aiding and abetting breaches of fiduciary duty may have engaged in primary violations of duty—breaches of fiduciary duty on their own—the Court will, once more, be wary of duplicative recovery.  But an inquiry as to that best awaits consideration of the actual proof.

### c. *Civil Conspiracy (Counts 33 (Rennert),* *41 (Director and Officer Defendants)*

In Counts 33 and 41, the Trustee charges Rennert and the Director and Officer Defendants with civil conspiracy. They move to dismiss the conspiracy claims on the ground that New York does not recognize an independent tort for civil conspiracy, or alternatively that the claims for civil conspiracy are duplicative of the other causes of action. The Court agrees, and those claims are dismissed.

New York does not recognize an independent tort of civil conspiracy,[177] but does permit a claim of civil conspiracy to "connect the actions of separate defendants with an otherwise actionable tort."[178] Consequently, "[w]hile there is no cognizable action for a civil conspiracy, a plaintiff may plead conspiracy … with an actionable underlying tort and establish that those acts flow from a common scheme or plan."[179]

The claim of civil conspiracy thus requires a threshold determination that the plaintiff has adequately alleged an actionable underlying tort.[180] After this threshold showing is made, a plaintiff must allege (i) facts constituting a common agreement or understanding, (ii) a common design or objective, (iii) the tortious or criminal acts committed in furtherance of the common agreement and objective, (iv) the intent and knowledge of the defendants regarding the acts, and (v) damage or injury as a result of the acts of the defendants.[181]

---

[177]    *See, e.g.*, *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006) ("New York does not recognize an independent tort of conspiracy.").

[178]    *Alexander & Alexander of New York, Inc. v. Fritzen*, 68 N.Y.2d 968, 969 (1986).

[179]    *Am. Preferred Prescription, Inc. v. Health Mgmt., Inc.*, 252 A.D.2d 414, 416, 678 N.Y.S.2d 1 (1st Dep't 1998).

[180]    *Charney v. Sullivan & Cromwell LLP*, 2007 WL 2822423, at *3 (N.Y. Sup. Ct. New York County Sept. 27, 2007).

[181]    *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 259 (S.D.N.Y. 2005).

The Trustee alleges that each of Rennert and the Director and Officer Defendants "combined, associated, agreed, mutually undertook, or concerted together with other Defendants" to injure the Debtors by causing the Debtors' officers and directors to "breach their respective fiduciary duties" and "to aid and abet the fraudulent conveyances."[182]  Though several of the causes of action for breach of fiduciary duty and aiding and abetting fraudulent conveyance are dismissed in this Decision—thereby foreclosing a derivative claim for civil conspiracy based on those torts—some of the underlying causes of action survive.  Thus, even though the Court agrees with the Defendants that there is no independent claim for conspiracy, the Court arguably must decide whether the civil conspiracy claims can, at least in part, survive pending further consideration of the relevant underlying torts.

In the second prong of their argument, the Defendants contend that the causes of action for civil conspiracy should be dismissed because they are duplicative of the other asserted underlying torts.  The Court agrees.  Several courts have held that under New York law, where the conduct put forth in support of a claim of conspiracy is the same conduct that supports the underlying actionable torts, the conspiracy claim should be dismissed as duplicative.[183]  Here, the alleged conduct in support of the conspiracy claims

---

[182]    *See* Cmplt. ¶ 554 (making such a claim against Rennert); *accord* Cmplt. ¶ 604 (Director and Officer Defendants).

[183]    *See Briarpatch Ltd. v. Geisler Roberdeau, Inc.*, 2007 WL 1040809, at *26 ("Here, Plaintiffs' alleged overt acts in support of the conspiracy claim are essentially the same alleged acts that form the basis of the aiding and abetting claim.  Therefore, the [complaint's] First Cause of Action (conspiracy) is duplicative of the Second Cause of Action (aiding and abetting)."); *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 332 (Bankr. S.D.N.Y. 1999) ("Here, the overt acts alleged by the Trustee are the breaches of fiduciary duty; however, they are already embodied in the Complaint's Fifth, Sixth, Seventh and Ninth Claims for Relief asserted against Porush, Belfort and Maxwell, respectively. Accordingly, the Eleventh Cause of Action is duplicative of those claims and should be dismissed."); *Kew Gardens Hills Apartment Owners, Inc. v. Horing Welikson & Rosen, PC*, 35 A.D.3d 383, 384, 828 N.Y.S.2d 98, 101 (2d Dep't 2006) ("The Lender and Hewitt are correct, however, that the seventh cause of action alleging conspiracy

is identical to that alleged in the causes of action asserted against each Defendant for breach of fiduciary duty. Except for the conclusory allegation that each Conspiracy Defendant "associated" and "mutually undertook" with each of the other Conspiracy Defendants, the Trustee does not allege any independent acts beyond that conduct supporting the relevant underlying torts. And New York courts have consistently required a plaintiff to allege "in addition to the conspiracy, *independent overt acts* undertaken in pursuit of that conspiracy."[184] Absent the allegation of such independent overt acts, the causes of action for conspiracy fail.

Accordingly, the Court finds that the causes of action for conspiracy are duplicative of other claims set forth in the Complaint, and the motions to dismiss Counts 33, and 41 are granted.[185]

### 3. Claims Against Sabel and Sabel Holdings

In Counts 48 through 50, the Trustee asserts claims against the Sabel Defendants for receipt of fraudulent transfer, aiding and abetting fraudulent transfer, and unjust enrichment, respectively. They do not move against the fraudulent transfer and unjust enrichment claims, but move to dismiss the claims for aiding and abetting fraudulent transfers.[186] Their motion is granted.

The Sabel Defendants argue that the claims for aiding and abetting fraudulent conveyances should be dismissed under Alabama law, but the Trustee argues that they

---

[ ]       to breach a fiduciary duty should have been dismissed pursuant to CPLR 3211(a)(7) because it is duplicative of the aiding and abetting cause of action.").

[184]     *Sec. Investor Prot. Corp.*, 234 B.R. at 332 (emphasis added).

[185]     Additionally, as noted above at page 67 above, this determination results in an additional basis for the dismissal of the claims alleged against the Outsider Defendants, in Counts 7, 14, 21 and 27.

[186]     The Sabel Defendants also move to dismiss Count 51, asserting claims for violation of Del. Gen. Corp. L. § 170 against them along with all other defendants. The several motions with respect to Count 51 are addressed at page 75 below.

-74-

must be evaluated under New York law.  In this respect, the Court agrees with the

Trustee.  They are governed by New York law, for the reasons set forth above.  But for

the reasons noted at page 63 *et seq.* above, these claims are not actionable under New

York law.  Just as the state aw claims for aiding and abetting were dismissed against

others who did not receive property through alleged fraudulent conveyances, they must

be dismissed against the Sabel Defendants as well.

Similarly, the Court will dismiss the claims against the Sabel Defendants asserting

aiding and abetting fraudulent conveyances under section 548, for the reasons discussed

75 above.

### 4. *Claims Against all Defendants*

In Count 51, the Trustee asserts claims against all of the Defendants for violation

of Delaware General Corporation Law § 170.[187]  All of the Defendants except for

Rennert move to dismiss Count 51, arguing that § 170 applies only to a corporation's

directors, and thus cannot support liability for the non-director Defendants.  The Court

agrees in substantial part, qualifying its agreement to say that § 170 applies only to the

directors of the corporation paying the dividend *and to* stockholders receiving it, and thus

grants Count 51 is dismissed as to all Defendants other than Rennert and Renco Group.[188]

Section 170(a) provides, in relevant part:

> The directors of every corporation, subject to any
> restrictions contained in its certificate of
> incorporation, may declare and pay dividends upon
> the shares of its capital stock … either (1) out of its
> surplus, as defined in and computed in accordance

---

[187]     Del. Code Ann. Tit. 8, § 170 (2003).

[188]     The Trustee does not allege that MagCorp issued any unlawful dividends, and therefore Count 51
can only be brought on behalf of Metals.  If any defendants other than Renco Group were
stockholders and received the dividend, leave to amend is granted.

> with §§ 154 and 244 of this title, or (2) in case there
> shall be no such surplus, out of its net profits for the
> fiscal year in which the dividend is declared and/or
> the preceding fiscal year.

By its plain terms, § 170 only addresses the funds from which directors may

declare dividends, providing that dividends must be paid from either the corporation's

surplus or its net profits.  Liability is not derived from this section itself, but rather from

its interplay with accompanying provisions in the Delaware General Corporation Law.

Thus, § 173 states that "[n]o corporation shall pay dividends except in accordance with

this chapter."[189]  And most critically for the purposes here, § 174 provides, in pertinent

part:

> (a) In case of any wilful or negligent violation of
> § 160 or 173 of this title, the directors under whose
> administration the same may happen shall be jointly
> and severally liable, at any time within 6 years after
> paying such unlawful dividend or after such
> unlawful stock purchase or redemption, to the
> corporation, and to its creditors in the event of its
> dissolution or insolvency, to the full amount of the
> dividend unlawfully paid, or to the full amount
> unlawfully paid for the purchase or redemption of
> the corporation's stock, with interest from the time
> such liability accrued …. (c) Any director against
> whom a claim is successfully asserted under this
> section shall be entitled, to the extent of the amount
> paid by such director as a result of such claim, to be
> subrogated to the rights of the corporation against
> stockholders who received the dividend on, or
> assets for the sale or redemption of, their stock with
> knowledge of facts indicating that such dividend,
> stock purchase or redemption was unlawful under
> this chapter, in proportion to the amounts received
> by such stockholders respectively.[190]

---

[189]    Del. Code Ann. Tit. 8, § 173 (2003).

[190]    *Id.* at § 174.

The Trustee has alleged facts that set forth the necessary elements for a claim under § 170 against Rennert—who, so far as the Complaint reflects, was Renco Metals' sole director during the relevant time period.  However, the Trustee further asserts that all of the Defendants—including non-directors and non-shareholders—are liable under § 170, either directly or for aiding and abetting.  The Court disagrees.

The first step when resolving a dispute as to statutory interpretation is to consider the relevant language itself.[191]  Here, the relevant sections of the Delaware General Corporation Law are unambiguous.  Section 170 states that the "*directors* of every corporation … may declare and pay dividends…."[192]  Section 174(a) provides that "[i]n case of any wilful or negligent violation of § 160 or 173 of this title, *the directors* … shall be jointly and severally liable … to the corporation…."[193]  The Delaware legislature clearly provided that the right to declare dividends and liability for unlawfully issued dividends attached to one group—a corporation's directors.

However, this does not wholly end the Court's inquiry, because the trustee seeks also to recover from the one or more shareholders that received allegedly improper dividends and stock redemptions.  Although both sides failed to address § 174(c), the Court believes that it is relevant to this determination.  Section 174(c) provides that directors found liable under § 174(a) are entitled to have their claim "subrogated to the rights of the corporation against stockholders who received the dividend…."  Section 174(c) thus recognizes an existing right on the part of the corporation, presumably under

---

[191]     *See, e.g.*, *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240-41 (1989).

[192]     Emphasis added.

[193]     Emphasis added.

common law, to recover, from a receiving shareholder, an unlawful issued dividend.[194]
Otherwise, the provision granting directors the right of subrogation would have no
meaning.[195]

While litigants may in future cases debate the level of scienter or bad faith on the
part of the payment recipient that is an element to a claim for recovery of improperly
issued dividends or stock repurchases, the Court does not need to do so here—as the
Trustee has alleged facts with respect to Rennert and Renco Group sufficient to show
knowledge that the payments were improper, and to establish any requisite bad faith.
However, the Trustee has failed to cite any authority that holds *professionals* or *officers*
liable for unlawful dividends under §§ 170, 173, or 174—either directly or on a theory of
aiding and abetting.  Accordingly, Count 51 will stand against Defendants Rennert and
Renco Group, but the other Defendants' motions to dismiss Count 51 are granted.

<u>Remaining Contentions</u>

The Court has considered the other asserted grounds for dismissal, and finds that
they are either without merit, present factual questions that cannot be adjudicated on a
motion to dismiss, or are moot in light of the other rulings in this decision.

---

[194]    *See Sheffield Steel Corp. v. HMK Enters., Inc. (In re Sheffield)*, 320 B.R. 405, 415 (Bankr. N.D. Ok. 2004) (Rasure, J.) ("The Court concludes that a corporation may assert a claim under Delaware common law against a shareholder who received an unlawful dividend."); *PHP Liquidating LLC v. Robbins*, 291 B.R. 603, 608-09 (D. Del. 2003) (Farnan, J.) (recognizing that principle, but denying relief because claim was brought by assignee of individual creditors, and not the corporation, and because of failure to allege knowledge that stock redemption was unlawful or was received in bad faith).  *See also In re Kettle Fried Chicken of Am., Inc.*, 513 F.2d 807, 813-14 (6th Cir. 1975) (recognizing a cause of action under section 174 for shareholder recipients of unlawful stock redemptions when capital impaired, but vague as to whether this was an implied right of action under section 174, or under common law).

[195]    *See Sheffield Steel*, 320 B.R. at 415 ("By granting directors a right of subrogation "to the rights of the corporation against stockholders," the statute acknowledges that a corporation has the right to recover unlawful dividends from stockholders.  If corporations did not have such rights, the provision granting directors subrogation would be meaningless.").

<u>Conclusion</u>

For the foregoing reasons, the defendants' motions to dismiss are granted to the

extent set forth in the table attached as Appendix A.

SO ORDERED.

Dated:     New York, New York               ___***s/ Robert E. Gerber***___
           January ***16,*** 2009            United States Bankruptcy Judge

APPENDIX A

| Count # | Defendant(s) | Shorthand Description | Asserted Bases for Dismissal | Disposition |
|---|---|---|---|---|
| 1 | KPMG | Breach of Contract | Statute of Limitations, Wagoner Rule | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and *in pari delicto* |
| 2 | KPMG | Negligence/Professional Malpractice | Statute of Limitations, Wagoner Rule | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and *in pari delicto* |
| 3 | KPMG | Negligent Misrepresentation | Statute of Limitations, Wagoner Rule | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and *in pari delicto* |
| 4 | KPMG | Aiding and Abetting Fraudulent Conveyance, federal and state, including NY DCL § 273 | Statute of Limitations, Wagoner Rule, Failure to State a Claim | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and *in pari delicto*, and for failure to state a claim |
| 5 | KPMG | Breach of Fiduciary Duty | Statute of Limitations, Wagoner Rule | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and *in pari delicto* |
| 6 | KPMG | Aiding and Abetting Breach of Fiduciary Duty | Statute of Limitations, Wagoner Rule | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and *in pari delicto* |
| 7 | KPMG | Conspiracy | Statute of Limitations, Wagoner Rule, Failure to State a Claim | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and *in pari delicto*, and for failure to state a claim |
| 8 | DLJ | Breach of Contract | Failure to State a Claim | Dismissal on statute of limitations denied, but but dismissed under Wagoner Rule, for lack of standing and *in pari delicto* |
| 9 | DLJ | Negligence | Statute of Limitations, Wagoner Rule | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and *in pari delicto* |
| 10 | DLJ | Negligent Misrepresentation | Statute of Limitations, Wagoner Rule | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and  *in pari delicto* |

| 11 | DLJ | Aiding and Abetting Fraudulent Conveyance, federal and state, including NY DCL § 273 | Wagoner Rule, Statute of Limitations, Failure to State a Claim | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and *in pari delicto*, and for failure to state a claim |
|----|-----|------|------|------|
| 12 | DLJ | Breach of Fiduciary Duty | Statute of Limitations, Wagoner Rule | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and *in pari delicto* |
| 13 | DLJ | Aiding and Abetting Breach of Fiduciary Duty | Statute of Limitations, Wagoner Rule | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and *in pari delicto* |
| 14 | DLJ | Conspiracy | Wagoner Rule, Failure to State a Claim | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and *in pari delicto*, and for failure to state a claim |
| 15 | Houlihan Lokey | Breach of Contract | Statute of Limitations, Wagoner Rule | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and *in pari delicto* |
| 16 | Houlihan Lokey | Negligence | Statute of Limitations, Wagoner Rule | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and *in pari delicto* |
| 17 | Houlihan Lokey | Negligent Misrepresentation | Statute of Limitations, Wagoner Rule | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and *in pari delicto* |
| 18 | Houlihan Lokey | Aiding and Abetting Fraudulent Conveyance, federal and state, including NY DCL § 273 | Failure to State a Claim | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and *in pari delicto*, and for failure to state a claim |
| 19 | Houlihan Lokey | Breach of Fiduciary Duty | Statute of Limitations, Wagoner Rule | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and *in pari delicto* |

| 20 | Houlihan Lokey | Aiding and Abetting Breach of Fiduciary Duty | Statute of Limitations, Wagoner Rule | Dismissal on statute of limitations grounds denied, but dismissed under Wagoner Rule, for lack of standing and *in pari delicto* |
|----|----|----|----|----|
| 21 | Houlihan Lokey | Conspiracy | Wagoner Rule, Failure to State a Claim | Dismissed under Wagoner Rule, for lack of standing and *in pari delicto*, and for failure to state a claim |
| 22 | Cadwalader | Negligence/Professional Malpractice | Statute of Limitations, Wagoner Rule | Dismissed as untimely; dismissed under Wagoner Rule, for lack of standing and *in pari delicto* |
| 23 | Cadwalader | Negligent Misrepresentation | Statute of Limitations, Wagoner Rule | Dismissed as untimely; dismissed under Wagoner Rule, for lack of standing and *in pari delicto* |
| 24 | Cadwalader | Aiding and Abetting Fraudulent Conveyance, federal and state, including NY DCL § 273 | Statute of Limitations, Wagoner Rule, Failure to State a Claim | Dismissed as untimely; dismissed under Wagoner Rule, for lack of standing and *in pari delicto*, and for failure to state a claim |
| 25 | Cadwalader | Breach of Fiduciary Duty | Statute of Limitations, Wagoner Rule | Dismissed as untimely; dismissed under Wagoner Rule, for lack of standing and *in pari delicto* |
| 26 | Cadwalader | Aiding and Abetting Breach of Fiduciary Duty | Statute of Limitations, Wagoner Rule, Failure to State a Claim | Dismissed as untimely; dismissed under Wagoner Rule, for lack of standing and *in pari delicto* |
| 27 | Cadwalader | Conspiracy | Statute of Limitations, Wagoner Rule, Failure to State a Claim | Dismissed as untimely; Dismissed under Wagoner Rule, for lack of standing and *in pari delicto*, and for failure to state a claim |
| 28 | Rennert | Negligent Misrepresentation | Statute of Limitations (for events before August 2, 1997), *in pari delicto* | Claim survives |
| 29 | Rennert | Fraudulent Conveyance, federal and state, including NY DCL § 273 | Not moved against | Claim survives |
| 30 | Rennert | Aiding and Abetting Fraudulent Conveyance, federal and state, including NY DCL § 273 | *in pari delicto,* Failure to State a Claim | Claim survives |

| 31 | Rennert | Breach of Fiduciary Duty | Statute of Limitations (for events before August 2, 1997), Failure to State a Claim, *in pari delicto* | Claim survives |
|---|---|---|---|---|
| 32 | Rennert | Aiding and Abetting Breach of Fiduciary Duty | Statute of Limitations (for events before August 2, 1997), *in pari delicto,* Failure to State a Claim | Claim survives |
| 33 | Rennert | Conspiracy | Statute of Limitations (for events before August 2, 1997), Failure to State a Claim | Dismissed for failure to state a claim |
| 34 | Rennert | Liability of Director for Unlawful Payment of Dividend or Unlawful Stock Redemption, Del. General Corporate Law § 174 | Not moved against | Claim survives |
| 35 | Rennert, D'Atri, and Sadlowski | Statutory Misconduct of Director and Officer, NY BCL § 720 | Not moved against | Claim survives |
| 36 | D'Atri, Fay, Sadlowski, Ryan, Legge, Thayer, Ogaard, Brown, and Kaplan | Negligent Misrepresentation | Statute of Limitations, *in pari delicto* | Claim survives |
| 37 | Legge, Thayer, Ogaard, Brown and Kaplan | Fraudulent Conveyance, federal and state, including NY DCL § 273 | Statute of Limitations | Claim survives |
| 38 | D'Atri, Fay, Sadlowski, Ryan, Legge, Thayer, Ogaard, Brown, and Kaplan | Aiding and Abetting Fraudulent Conveyance, federal and state, including NY DCL § 273 | Failure to State a Claim, *in pari delicto* | Dismissed for failure to state a claim |
| 39 | D'Atri, Fay, Sadlowski, Ryan, Legge, Thayer, Ogaard, Brown, and Kaplan | Breach of Fiduciary Duty | Statute of Limitations, Failure to State a Claim, *in pari delicto* | Claim survives |
| 40 | D'Atri, Fay, Sadlowski, Ryan, Legge, Thayer, Ogaard, Brown, and Kaplan | Aiding and Abetting Breach of Fiduciary Duty | Statute of Limitations, Failure to State a Claim, *in pari delicto* | Claim survives |

| 41 | D'Atri, Fay, Sadlowski, Ryan, Legge, Thayer, Ogaard, Brown, and Kaplan | Conspiracy | Statute of Limitations, Failure to State a Claim, *in pari delicto* | Dismissed for failure to state a claim |
|----|----|----|----|----|
| 42 | Renco Group | Fraudulent Conveyance, federal and state, including NY DCL § 273 | Not moved against | Claim survives |
| 43 | Renco Group | Preferential Transfers, Code § 547(b) (MagCorp preferential transfers) | Not moved against | Claim survives |
| 44 | Renco Group | Preferential Transfers, Code § 547(b) (Metals preferential transfers) | Not moved against | Claim survives |
| 45 | Renco Group | Aiding and Abetting Breach of Fiduciary Duty | Statute of Limitations (for events before August 2, 1997), Failure to State a Claim | Claim survives |
| 46 | Rennert, D'Atri, Unidentified Trustees of the Rennert Trusts | Fraudulent Transfer, Code § 550 and NY DCL § 273 | Not moved against | Claim survives |
| 47 | Rennert, D'Atri, Unidentified Trustees of the Rennert Trusts | Unjust Enrichment | *in pari delicto* | Claim survives |
| 48 | Sabel Holdings | Fraudulent Transfer, Code § 548 | Not moved against | Claim survives |
| 49 | Keith Sabel and Sabel Holdings | Aiding and Abetting Fraudulent Conveyance, federal and state law, including Alabama Fraudulent Transfer Act | Failure to State a Claim | Dismissed for failure to state a claim |
| 50 | Sabel Holdings | Unjust enrichment | Not moved against | Claim survives |
| 51 | All Defendants | Improper Dividends under Del. General Corporate Law § 170 | Failure to State a Claim (except not moved against by Rennert) | Claim survives as asserted against Rennert, Renco Group.  Dismissed insofar as asserted against other defendants, for failure to state a claim |

-84-